2011 WY 97

**Greg HUNTER and Staci Hunter, husband and wife, Appellants (Defendants),**

v.

**Ron REECE and Linda Reece, Appellees (Plaintiffs).**

No. S–10–0195.

Supreme Court of Wyoming.

June 23, 2011.

Representing Appellants: Jeffrey J. Gonda and Amanda K. Roberts, Lonabaugh & Riggs, LLP, Sheridan, Wyoming. Argument by Ms. Roberts.

Representing Appellees: Vincent Schutte, Kinnaird Law Office, PC, Sheridan, Wyoming.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

BURKE, Justice.

[¶ 1]   Ron and Linda Reece brought suit against Greg and Staci Hunter claiming that the Hunters owed them money pursuant to a contract.  Having heard the evidence at trial, the district court found that there was no valid contract, but awarded damages to the Reeces on an unjust enrichment theory.  The Hunters appealed.  We will reverse the district court's decision.

### ISSUES

[¶ 2]   The Hunters present three issues:

1.   Did the district court err by disregarding the parties' stipulation that a valid and enforceable contract existed and by raising a claim of unjust enrichment *sua sponte* ?

2.   Whether the district court erred in finding that Plaintiffs proved the elements of unjust enrichment.

3.   Whether the district court erred in denying Defendants' Rule 59 motion for

new trial and alternative motion to amend the judgment.

### FACTS

[¶ 3] Ron and Linda Reece owned and operated a construction business in Sheridan County, Wyoming. In the fall of 2006, Mr. Reece was doing renovation work at the home of Greg and Staci Hunter. He noticed Mrs. Hunter watching a television program about "flipping" houses. According to trial testimony from both parties, flipping a house generally involves purchasing a house that needs improvements, making those improvements, and selling the house, usually in a relatively short period of time, and preferably for a profit. Mr. Reece and Mrs. Hunter both commented that they would be interested in flipping a house.

[¶ 4] After further discussions between the Reeces and the Hunters, the two couples agreed to flip a house located at 708 Broadway in Sheridan. Later, they all met to put their agreement in writing, with Mrs. Hunter typing up the document. The contract, in its entirety, provided as follows:

Contract Agreement for Property 708 Broadway

This contract agreement for property 708 Broadway is between Greg Hunter along with his wife Staci and Ron Reece, along with his wife Linda.

A verbal agreement in September of 2006 made between Greg Hunger and Ron Reece, for the renovation process and "flip" of 708 Broadway was made. This discussion included the following:

Greg Hunter is to purchase this property and pay for all renovations with all expenses being approved by Staci Hunter with the approximate budget of $30,000. Staci Hunter is to be in charge of all final decisions including budget and design elements of the house including interior and exterior.

Ron Reece will be supplying labor and knowledge of building codes and will hire his employees to work along side him when needed for projects that require more th[a]n one man (i.e.), the roof and major framing and demolition and to be approved by Staci. Greg will then pay employees their base wage that Ron is currently paying them.

After the renovation process of this property is complete, the property will then be sold and the division of profit will be split 50% to Greg and Staci Hunter and 50% to Ron and Linda Reece after total expenses are deducted.

The contract was signed by all four persons, and dated October 28, 2006.

[¶ 5] Work on the project began in November of 2006. As the work progressed, the Reeces submitted invoices to Mrs. Hunter for the expenses incurred by the Reeces, and for the time spent by the Reeces' employees working on the project. At this time, the Reeces did not submit any invoices for Mr. Reece's labor on the project.

[¶ 6] At the end of January 2007, an arsonist set fire to the house, causing substantial damage. The Hunters had insured the house and, in cooperation with the Reeces, submitted a claim to the insurance company. The Reeces and Hunters then entered into a new "Fire Contract" in which they agreed to use the insurance proceeds to restore the house to the condition it was in before the fire. Included in this agreement was a provision that Mr. Reece would be paid $35.00 per hour for his work in restoring the house. The parties further agreed that once the house was restored, they would revert back to their original agreement. During the time the parties operated under the "Fire Contract," the Reeces submitted invoices that included the hours Mr. Reece and his employees spent working on the project.

[¶ 7] In August of 2007, the parties agreed that the house had been restored, and that the original agreement was again in effect. The Reeces continued to submit invoices covering the hours for their employees and their out of pocket expenses. They no longer submitted invoices for any of Mr. Reece's time working on the project.

[¶ 8] In October of 2007, the Hunters became dissatisfied with the slow progress on the project, and with what they perceived as the poor quality of some of Mr. Reece's work. The Hunters also came to believe that Mr.

Reece could be doing more of the work by himself instead of paying his employees to work on the project. They confronted Mr. Reece about their dissatisfactions, an argument ensued, and the Hunters eventually told Mr. Reece to stop working on the project. The Hunters hired other contractors, at a total cost of $16,000.00, to complete the project, and to correct some of the work already done by Mr. Reece.

[¶ 9] On April 8, 2008, the Reeces filed suit against the Hunters. The two-page complaint sought a declaratory judgment that the contract quoted above "is a valid and enforceable agreement," and alleged that the Reeces were entitled to "receive 50% or ½ of net profit after payment of cost of renovation and purchase price." The Hunters answered, admitting the existence and validity of the contract, but generally denying the other allegations. The Hunters also pleaded counterclaims, including breach of contract by the Reeces.

[¶ 10] The parties engaged in discovery and other trial preparations until, on August 27, 2009, the Reeces moved the district court to order mediation of the dispute. Mediation was ordered, but was apparently unsuccessful, because on September 29, 2009, the district court set a trial date in the matter. Prior to trial, the parties stipulated to the existence and validity of their contract, although each asserted a different interpretation of that contract. The Reeces contended that they were entitled to payment for Mr. Reece's labor on the project, in addition to one half of the profits. The Hunters contended that the Reeces were entitled only to one half of the profits, because the agreement did not provide that Mr. Reece would be paid for his labor.

[¶ 11] A two-day bench trial commenced on March 3, 2010. At the close of trial, the district court announced judgment that the parties' contract was not valid because there had been no meeting of the minds regarding an essential term of the agreement, that being whether Mr. Reece was to be paid for his work on the project in addition to receiving one half of the profits. The district court then invoked the theory of unjust enrichment to award all of the profits to the Reeces, an

amount the district court calculated as $21,989.07. A written judgment embodying the district court's decision was entered on March 26, 2010.

[¶ 12] On April 8, 2010, the Hunters filed a motion for new trial or, in the alternative, to amend the judgment, asserting generally that the parties had stipulated to the validity of their contract, that it was improper to apply a theory of unjust enrichment when a valid contract existed, and that unjust enrichment had never been pleaded by the Reeces. A hearing was held, and the district court entered an order denying the motion on July 2, 2010. The Hunters appealed both the judgment and the district court's denial of their motion for new trial or amended judgment.

## DISCUSSION

[¶ 13] "Whether a contract has been entered into depends on the intent of the parties and is a question of fact." *Wyoming Sawmills, Inc. v. Morris,* 756 P.2d 774, 775 (Wyo.1988). The district court found that no contract had been formed in this case. We presume that finding is correct, and uphold it unless it is "inconsistent with the evidence, clearly erroneous, or contrary to the great weight of the evidence." *Narans v. Paulsen,* 803 P.2d 358, 360 (Wyo.1990).

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Fremont Homes, Inc. v. Elmer,* 974 P.2d 952, 958 (Wyo.1999) (internal citations omitted);

*Jacoby v. Jacoby,* 2004 WY 140, ¶ 6, 100 P.3d 852, 854 (Wyo.2004).

[¶ 14] Throughout the litigation, the parties disagreed about the interpretation of their contract, but consistently agreed that they had entered into a contract. The Reeces in their complaint alleged that they and the Hunters had "entered into a written agreement as set forth on the attached Exhibit A." The Hunters admitted this allegation in their answer. In their pretrial memoranda, both parties listed proposed findings of fact to the effect that they had entered into a valid, binding contract. Prior to trial, the parties stipulated that "the Contract at issue, Exhibit A attached to the Complaint, was a valid and enforceable contract."

[¶ 15] At trial, counsel for both parties continued to maintain that a valid and enforceable contract existed. During closing argument by the Reeces' attorney, however, the district court asked,

> Do you think we even had a contract? My sense of this arguably is that they went along for a year until October of 2007 when they finally realized there was maybe never any meeting of the minds. The Hunters' perspective of it was that Reece was to work for half of the profits, that it's, no compensation for his time. Reece's perspective was ... that he was to be paid for his time before profits were calculated....
> It took them a year to figure out they didn't have a contract, a meeting of the minds.
>
> Do you agree or disagree with that?

Counsel for the Reeces made this response:

> I disagree, Your Honor. I mean, we've heard from all of the parties, I think every single one of [the] parties that they thought there was a contract. The only part we've disagreed on in this entire thing is that the Reeces have said that, yes, they did discuss and contemplate that their wages would be paid, the Hunters have said, no, they did not, and it conveniently became a problem after the Reeces were fired. So I believe that there was a meeting of the minds.

The district court posed a similar question to counsel for the Hunters, who also reiterated their position that they had a contract with the Reeces.

[¶ 16] Nevertheless, when the district court announced its judgment at the end of the trial, it found that there was no contract because "there was not a meeting of the minds with the terms of the contract." The district court found that the Reeces' "understanding of the contract" was that "his labor would be an expense deducted from the proceeds of the sale," while the Hunters' understanding was "that his labor would be paid exclusively out of 50 percent of the profit, if any, that was made." It may be that the Reeces and the Hunters entered into their agreement with different understandings and intentions. However:

> A party's subjective intent is not relevant in contract interpretation cases because we use an objective approach to interpret contracts. *Roussalis v. Wyo. Med. Center, Inc.,* 4 P.3d 209, 231 (Wyo.2000). In *Shrum v. Zeltwanger,* 559 P.2d 1384, 1387 (Wyo.1977), in the context of an ambiguous contract, we stated:
>
> > ... The intent of the parties can only be ascertained by an objective not subjective approach in contract situations. The subjective intent of the parties is ordinarily irrelevant. An objective test is applied. A party's intention will be held to be what a reasonable man in the position of the other party would conclude his manifestations to mean. Calamari & Perillo, Law of Contracts, HB, § 12, p. 14; 13 Williston on Contracts, 3d Ed. (Jaeger), § 1536, p. 11.
>
> *See also,* Williston on Contracts, §§ 30:6, 31:4 (unambiguous contracts); 33:39 (ambiguous contracts) 4th Ed. (1999). Thus, evidence of the declarants' subjective intention is not relevant or admissible to interpret the contract, whether its language is ambiguous or not.

*Omohundro v. Sullivan,* 2009 WY 38, ¶ 24, 202 P.3d 1077, 1084–85 (Wyo.2009).

[¶ 17] By their pleadings and their trial presentations, the Reeces and the Hunters asked the district court to interpret their contract. One of the "settled rules of contract interpretation" is to "begin with the language of the contract." *Wyoming Bd. of*

*Land Comm'rs v. Antelope Coal Co.,* 2008 WY 60, ¶ 8, 185 P.3d 666, 668 (Wyo.2008).

[T]he words used in the contract are afforded the plain meaning that a reasonable person would give to them. *Doctors' Co. v. Insurance Corp. of America,* 864 P.2d 1018, 1023 (Wyo.1993). When the provisions in the contract are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties. *Union Pacific Resources Co. [v. Texaco],* 882 P.2d [212,] 220 [ (Wyo.1994) ]; *Prudential Preferred Properties [v. J and J Ventures ],* 859 P.2d [1267,] 1271 [ (Wyo.1993) ]. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate. *Sinclair Oil Corp. v. Republic Ins. Co.,* 929 P.2d 535, 539 (Wyo.1996).

*Amoco Prod. Co. v. EM Nominee Partnership Co.,* 2 P.3d 534, 540 (Wyo.2000).

▬▬▬ [¶ 18] "When contractual language is clear and unambiguous, the interpretation and construction of contracts is a matter of law for the courts." *Thorkildsen v. Belden,* 2011 WY 26, ¶ 8, 247 P.3d 60, 62 (Wyo.2011). We review questions of law *de novo. Id.* Accordingly, we may review and interpret the contract language in this appeal even though the district court declined to do so.

[¶ 19] The pertinent contract language is as follows:

Greg Hunter is to purchase this property and pay for all renovations with all expenses being approved by Staci Hunter with the approximate budget of $30,000. Staci Hunter is to be in charge of all final decisions including budget and design elements of the house including interior and exterior.

Ron Reece will be supplying labor and knowledge of building codes and will hire his employees to work along side him when needed for projects that require more th[a]n one man (i.e.), the roof and major framing and demolition and to be approved by Staci. Greg will then pay employees their base wage that Ron is currently paying them.

After the renovation process of this property is complete, the property will then be sold and the division of profit will be split 50% to Greg and Staci Hunter and 50% to Ron and Linda Reece after total expenses are deducted.

[¶ 20] The Reeces relied primarily on the first quoted paragraph, pointing out that the contract required Mr. Hunter to "pay for all . . . expenses." The Reeces contended that wages for Mr. Reece's work on the house were one of the "expenses" that the Hunters were required to pay. Under the Reeces' proposed interpretation of the contract, Mr. Reece's wages should be paid before the profits are calculated and split between the parties.

[¶ 21] The Hunters relied primarily on the second quoted paragraph, which states that Mr. Reese "will be supplying labor." They contrasted this language with the provision that Mr. Reece "will hire his employees" when needed, and those employees would be paid "their base wage." The Hunters contended that, if the parties had intended for Mr. Reece to be paid wages, then the contract would have stated that and established a wage, just as it did for Mr. Reece's employees. Instead, the contract says that Mr. Reece will "supply" his labor, and it sets no wage for Mr. Reece. Because the contract distinguishes between Mr. Reece's labor and that of his employees, the Hunters urged the interpretation that Mr. Reece should not be paid wages, but should instead be compensated by one half of the profits.

▬▬▬ [¶ 22] The "language of the parties expressed in their contract must be given effect in accordance with the meaning which the language would convey to reasonable persons at the time and place of its use." *Union Pacific R.R. Co. v. Caballo Coal Co.,* 2011 WY 24, ¶ 15, 246 P.3d 867, 872 (Wyo. 2011). We conclude that the Hunters' interpretation reflects what the contract language would convey to a reasonable person. The contract makes no express provision to pay Mr. Reece wages, and the fact that such a provision is included for Mr. Reece's employees suggests that the parties did not contemplate paying wages to Mr. Reece. The Reeces' position that his wages were meant

to be included as expenses ignores the language more specifically relating to wages. This was a simple agreement by which the Hunters would provide the capital and the Reeces would provide the labor, except when more than one worker was needed. Profits would be split equally between those providing capital and those providing labor.

[¶ 23] The difficulty, of course, is that the profits turned out to be less than the parties anticipated when they entered into the contract. One half of the meager profits, the Reeces contended, was not fair compensation for his work. Recognizing that problem, the district court commented that this was "an ill-conceived contract relationship." Even if that is true in hindsight, courts "are not at liberty to rescue parties from the consequences of their unwisely made bargains," *Sowerwine v. Keith*, 997 P.2d 1018, 1020–21 (Wyo.2000), and we cannot rewrite the contract "under the guise of judicial construction." *Cheek v. Jackson Wax Museum*, 2009 WY 151, ¶ 23, 220 P.3d 1288, 1293 (Wyo.2009). Rather, we must "interpret contracts to effectuate the parties' intention, as expressed in the language of the agreement." *Id.* The unambiguous language of the agreement in this case provides that Mr. Reece was to supply his labor, while his employees were to be paid for theirs.

[¶ 24] Much of the evidence presented at trial was about what the parties did after signing their contract. This kind of evidence is often called "course of performance" evidence. Joseph M. Perillo, *Calamari and Perillo on Contracts* § 3.17, at 146 (6th ed. 2009); *see Linton v. E.C. Cates Agency, Inc.*, 2005 WY 63, ¶ 17, 113 P.3d 26, 30 (Wyo.2005). We have said that such evidence can be especially useful because "the practical construction put upon [a contract] by the parties should have great weight in determining its proper construction." *True Oil Co. v. Sinclair Oil Corp.*, 771 P.2d 781, 792 (Wyo.1989), citing *Rohrbaugh v. Mokler*, 26 Wyo. 514, 519, 188 P. 448, 450 (Wyo.1920) and other cases.

[¶ 25] However, course of performance evidence, like other extrinsic evidence, is used as a tool of interpretation only if the contract language is ambiguous.

It is true that, when a court determines that the contract language is ambiguous, it may consider the parties' historical performance of the contract in order to determine their intent. *True Oil Company v. Sinclair Oil Corporation*, 771 P.2d 781, 792 (Wyo.1989); *Sunburst Exploration, Inc. v. Jensen*, 635 P.2d 822, 825 (Wyo. 1981); *Holliday v. Templin*, 56 Wyo. 94, 103 P.2d 408, 413 (1940). We do not, however, look to extrinsic evidence of the parties' historical performance of a contract when the contract language is clear on its face. *See True Oil Company*, 771 P.2d at 790; *Sunburst Exploration, Inc.*, 635 P.2d at 823–24. The contract language in this case is clear, and we refuse, therefore, to consider the parties' performance of the contract to determine its meaning.

*Wolter v. Equitable Resources Energy Co.*, 979 P.2d 948, 953 (Wyo.1999). Because we have also concluded that the contract in this case is unambiguous, course of performance evidence need not be considered.

[¶ 26] On the other hand, this evidence was presented by both parties without any objections to its admissibility. Even if we were to consider this evidence, we would find that it supports the Hunters' interpretation of the contract. For example, it is undisputed that Mr. Reece submitted invoices for his labor when he was working under the "Fire Contract," in which the Reeces and Hunters expressly agreed that Mr. Reece would be paid $35.00 per hour. It is also undisputed that Mr. Reece submitted no invoices for his labor before or after the "Fire Contract" was in effect, that is, when the parties were performing under their original agreement. The Hunters contend, and we agree, that these facts indicate Mr. Reece's contemporaneous understanding of the original agreement was that he was not to be paid for his labor.

[¶ 27] At trial, Mr. and Mrs. Reece both disagreed with this contention, explaining their position that, under the original agreement, Mr. Reece's time was not supposed to be submitted or paid for until the project was completed. This explanation, while initially plausible, is seriously undercut by the fact

that the Reeces kept no records of Mr. Reece's hours under the original agreement, or at least none that were offered into evidence at trial. If the Reeces had anticipated payment for Mr. Reece's labor, they would be expected to keep records documenting his hours, as they did for Mr. Reece's hours while working under the "Fire Contract," and for the employees' hours throughout the project.

[¶ 28] Given the language of the written agreement, the parties' stipulation that it was a valid contract, and the course of performance evidence to the extent it may be considered, we conclude that the district court erred in finding that there was no contract. This finding is inconsistent with the great weight of the evidence, and we are left with the definite and firm conviction that a mistake has been committed. Interpreting the language of the agreement, we agree with the Hunters that Mr. Reece was not to be paid wages for his labor, but was to receive one half of the profits. Further, the Reeces could not claim unjust enrichment, because "the unjust enrichment remedy is not available when an express contract exists." *Sowerwine*, 997 P.2d at 1021. These findings and conclusions make it unnecessary to address the other issues presented by the Hunters.

[¶ 29] At this point, it would seem to serve the interests of judicial economy if we could avoid remand of this case and amend the judgment. *See Thorkildsen*, ¶ 23, 247 P.3d at 66; *Lieberman v. Mossbrook*, 2009 WY 65, ¶ 48, 208 P.3d 1296, 1310 (Wyo.2009). The Hunters have provided us with a proposed calculation of damages. According to their brief, the amount of money left after the house was sold was $21,989.07. There is evidence in the record to support this fact, and indeed, this is the amount awarded to the Reeces by the district court when it determined that they were entitled to 100% of the profits. The Hunters also assert that they were required to spend an extra $16,000.00 to complete or correct some of Mr. Reece's work. If they had not needed to spend this extra money, the Hunters explain, then the total profits would have been $21,989.07 plus $16,000.00, for a total of $37,989.07. Pursuant to their contract, the Hunters propose to split that amount with the Reeces, each party getting $18,994.54. However, the Hunters further contend that the extra $16,000.00 reflects the amount that had to be spent because of the Reeces' failure to complete the work or perform it satisfactorily—in other words, that the Reeces breached the agreement and caused $16,000.00 in damages. The Hunters propose that they should recover that amount by reducing the Reeces' $18,994.54 share of the profits by subtracting the $16,000.00, leaving the Reeces with a final judgment of $2,994.54. We cannot accept the Hunters' proposed damages calculation because there is conflicting evidence that should be resolved by the district court.

[¶ 30] The Hunters presented evidence at trial supporting their contentions that the Reeces breached the contract. For example, one of the contractors hired after Mr. Reece was taken off the project testified that he worked to correct, among other problems, "doors that had gaps underneath them," and a wooden deck at the back of the house that "wasn't fastened to the house" and had fewer floor joists than required by the applicable building code. The Reeces countered with evidence that they had not breached the agreement. Mr. Reece denied that his work had been defective. He agreed that some of the work had been left incomplete, but explained that he was unable to complete the work only because he was "kicked off of the project" by the Hunters.

[¶ 31] The district court never reached a decision on the claim that the Reeces had breached the agreement, instead finding that no contract existed and awarding damages to the Reeces on an unjust enrichment theory. It is up to the district court, in the first instance, to consider the conflicting evidence and decide whether the Reeces breached the contract, and if so, what damages were caused by the breach. We must therefore return this case to the district court to determine damages.

[¶ 32] Reversed and remanded for such additional proceedings as may be needed in accordance with this decision.