2015 WY 79

**In the Interest of CDR, Minor.**

**MR, Appellant (Respondent),**

v.

**The State of Wyoming, Appellee (Petitioner).**

**No. S–14–0240.**

Supreme Court of Wyoming.

May 29, 2015.

Representing Appellant: Matthew D. Winslow of Keegan & Winslow, P.C., Cody, Wyoming.

Representing Appellee: Peter K. Michael, Wyoming Attorney General; Robin Sessions Cooley, Deputy Attorney General; Jill E. Kucera, Senior Assistant Attorney General; Shawnna M. Herron, Assistant Attorney General. Argument by Ms. Herron.

Representing Guardian ad Litem: Dan S. Wilde, Deputy State Public Defender, and Aaron S. Hockman, Chief Trial and Appellant Counsel, Wyoming Guardian ad Litem Program. Argument by Mr. Hockman.

Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.

DAVIS, Justice.

[¶ 1] The juvenile court in Park County revoked a consent decree in an educational neglect case [1] due to an alleged violation of the terms and conditions of that decree by the mother of the juvenile CDR. The boy's father MR appealed the court's order of revocation. We reverse.

## ISSUES

[¶ 2] Father poses two questions that we rephrase and renumber as follows:

1. Did the juvenile court lose jurisdiction over the neglect case after finding that the "educational concerns regarding the minor do appear to have been addressed"?

---

1. The State may initiate neglect proceedings under Wyo. Stat. Ann. §§ 14–3–411 and 412 (LexisNexis 2013) upon a complaint that a child's parents have failed or refused to adequately attend to his educational needs and wellbeing. *See* Wyo. Stat. Ann. § 14–3–202(a)(vii) (LexisNexis 2013).

2. Did the court err in finding that Mother violated the terms of the consent decree by drinking alcohol?

## FACTS

[¶ 3] The child in this case was twelve years old and in sixth grade at the Cody Middle School when the neglect case was filed. By mid-March of the 2013 spring semester, he had accumulated twenty unexcused full-day absences, and he was failing seven out of eight classes. The school's assistant principal reported those circumstances to the Wyoming Department of Family Services (DFS), which in turn conveyed them to the county attorney. On May 24, 2013, the county attorney filed a juvenile neglect petition alleging that Father and Mother had "failed or refused to provide adequate education necessary for the child's well being."[2]

[¶ 4] The juvenile court appointed a guardian *ad litem* to represent the child that same day. Following an initial appearance on June 10, it appointed separate attorneys to represent Mother and Father and selected a multidisciplinary team (MDT). On July 11, the parties[3] filed an "Agreement in Support of Consent Decree." A consent decree adopting and incorporating that agreement was also entered that day.

[¶ 5] The consent decree was to be effective for one year, during which the child was to remain in his parents' custody, and the child and parents were to fulfill a number of behavioral and counseling conditions. If either Father or Mother failed to adhere to those conditions, the decree could be declared void and the neglect proceedings could be reinstated as to both of them.[4] For purposes of this appeal, the most significant of those conditions was that Father and Mother obtain an alcohol/substance abuse evaluation and "follow the regimen of treatment recommended."

[¶ 6] A clinician at West Park Behavioral Health evaluated Mother on November 7, 2013. The portion of the evaluation report titled "Recommendation for Treatment" contained the following two paragraphs:

> It is recommended that [Mother] engage in a level III inpatient chemical dependency treatment program.

> It is furthermore recommended that she abstain from alcohol and all other mood altering substances for the remainder of her life.

However, at the November 14 MDT meeting, the DFS representative described Mother's evaluation as recommending only inpatient treatment.

[¶ 7] Eventually, due to a driving under the influence charge[5] and delays in review-

---

2. This was not the family's only involvement with DFS and the juvenile court at this time. Both CDR and his older brother had been adjudicated delinquent and were on probation. CDR was reportedly using marijuana on a regular basis and displaying serious defiance to authority figures at school and at home. In the older child's case, Mother was ordered to undergo an alcohol/substance abuse evaluation and follow any recommended treatment regimen.

3. The parties to the agreement included the child through his guardian *ad litem*, Mother and Father through their respective attorneys, the family's caseworker on behalf of DFS, and the State of Wyoming through a deputy county attorney.

4. Pursuant to Wyo. Stat. Ann. § 14–3–428 (LexisNexis 2013), the juvenile court holds those proceedings in abeyance for the agreed-upon life of the consent decree, but it may reinstate them if the parents violate the decree prior to its expiration. If the decree expires without such action, the parents are to be discharged and the neglect

proceedings are to be terminated. Although Father is not alleged to have violated the consent decree in any way, the agreement and decree based upon it are drafted in such a way that a violation by either parent can lead to an adjudication as to both. The GAL argued here that Father lacked standing because the only conduct at issue is Mother's, and she is not a party to the appeal. We agree with Father and the State that he has standing because he has been adjudicated as neglectful based on Mother's alleged violations of the decree. *Miller v. Wyo. Dep't of Health*, 2012 WY 65, ¶ 18, 275 P.3d 1257, 1261 (Wyo. 2012) (standing exists if allegedly erroneous decision actually injured the appellant and that injury can be redressed on appeal); *In re Adoption of CF*, 2005 WY 118, ¶ 39, 120 P.3d 992, 1004–05 (Wyo.2005) (standing exists if litigant has personal stake in judicial resolution of a particular controversy).

5. The record does not reveal the date of this offense, nor does it indicate that the juvenile court or any of the parties viewed the offense as

ing and selecting a program from potential treatment program options, Mother had to obtain an updated evaluation and treatment recommendation. That was provided by Julie Laib of Mental Health and Addiction Services on February 11, 2014. Ms. Laib found that Mother possessed limited skills for coping with her family and mental health issues, and that she posed a high risk of relapsing into insobriety. She therefore recommended a residential substance abuse treatment program focusing both on Mother's alcohol abuse and mental health problems, and that she continue family counseling to address marital conflict. Ms. Laib expressed no expectation that Mother would thereafter be free from relapse.

[¶ 8] After successfully completing an intensive thirty-day inpatient treatment program at the Cedar Mountain Center on May 2, 2014, Mother started outpatient treatment with Ms. Laib. She began with three hours per week of individual and group therapy on June 2, with the understanding that a higher level of outpatient care might become necessary if she failed to remain sober.

[¶ 9] On June 4, 2014, Father moved to dismiss the neglect case, asserting that "the purposes of the proceedings have been substantially met, the subject minor has successfully completed the school year, and there are no remaining matters to address in these proceedings that cannot be fully accomplished in other proceedings already in existence." Indeed, during the 2013 to 2014 school year, CDR's attendance and grades steadily and substantially improved to the point that he earned two "A"s, three "B"s, and two "C"s in seven graded classes.

[¶ 10] However, on June 16 and 18, 2014, the State filed motions to revoke the consent decree due to Mother's consumption of alcohol on May 28 and June 16,[6] respectively. In both instances the State contended those ac-

tions violated the requirement of the consent decree that Mother follow the treatment regimen recommended in her alcohol/substance abuse evaluation.[7] Father responded to that contention by noting that the decree did not prohibit either parent from consuming alcohol, and that Mother's current outpatient treatment program was designed to deal with the high likelihood that she would relapse, and accordingly included plans for that contingency.[8]

[¶ 11] At a hearing held on July 15, 2014, Mother expanded on those points by drawing the court's attention to the actual language used in the consent decree agreement. She noted that although the agreement did require her and Father to obtain a drug and alcohol evaluation and follow the treatment regimen recommended in the evaluation, contrary to the State's claim that she was to abstain from alcohol for life, it required nothing more than that she attend alcohol treatment and engage in rehabilitation. Mother characterized the abstention language used in her first evaluation as establishing a goal of treatment, rather than a part of a treatment regimen. She further noted that Ms. Laib's later evaluation contained no such language, and she urged the court to evaluate her actions in relation to the Laib evaluation because she was admitted to the Cedar Mountain inpatient treatment program on that basis.

[¶ 12] On July 16, 2014, the juvenile court sent a short opinion letter to the parties, informing them that it had decided to revoke the consent decree and instructing the county attorney to prepare an order to that effect. The court expressed the reason for its decision by stating:

The educational concerns regarding the minor do appear to have been addressed. No party disputes that. The issue for this

---

running afoul of a provision in the consent decree agreement that Mother was to lead a law-abiding life and violate no laws.

**6.** Father and Mother did not contest she drank on those dates, and Father reported the second instance to authorities himself.

**7.** The State also contended Mother's drinking violated the requirement in the consent decree

that she live a law-abiding life and violate no state or local laws. Because the juvenile court declined to address this contention, and the State did not raise it on appeal, we will do likewise.

**8.** Upon learning of Mother's relapse, Ms. Laib added another group therapy session per week to her treatment regimen, so that she then had to attend two two-hour group sessions and one hour of individual counseling each week.

court is whether [Mother] has violated the Consent Decree. Clearly she has. **This Court will decline to review definitions, the theory of treatment, or other ways to interpret the agreement. [Mother] was not to drink and everyone in the room knew that.** She went into residential treatment because of her drinking, and she has consumed twice since being released from treatment.

(Emphasis added.) Two days later and a month before the court issued its order, Father filed a motion seeking clarification of the decision letter.

[¶ 13] Father asked the court to specify what led it to conclude that "everyone in the room knew that" Mother had been prohibited from drinking, given that no such prohibition was stated in the consent decree agreement or otherwise stated by the court, either orally or in writing. He further asked the court to explain its definition of the term "treatment regimen" and how Mother's relapse could be deemed a failure to abide by any such regimen imposed in this case. In short, Father asked the court to clarify what led it to interpret the agreement as it did.

[¶ 14] On August 5, 2014, the court responded by letter to Father's motion. The court attached to the letter an excerpt from a transcript of a hearing held on January 14, 2014, which reflected its concerns over Mother's addiction.[9] It likewise referred to a November 14, 2013 MDT report which noted Father's frustration over her drinking. The three-page excerpt from the hearing mentions Mother twice. The court first said, "We both have watched your wife being destroyed by alcohol." It later said, "I have watched him come in here with clear eyes when his wife did not have them."

[¶ 15] Although the MDT report does indeed reflect Father's frustration, it also contains a brief description of Mother and Fa-

ther's just-completed initial substance abuse evaluations and the recommended treatment regimen each was to follow. Their DFS caseworker indicated that Father was to "abstain from the use of substances, provide UAs, participate in family counseling, participate in spouse chemical dependency treatment, participate in [CDR's] counseling, and attend outpatient family therapy."[10] She described Mother's recommended treatment regimen as "Inpatient treatment."

[¶ 16] The juvenile court entered its order on the State's and Father's motions on August 18, 2014. It incorporated its earlier decision letter by reference, revoked the consent decree, and reinstated the neglect proceedings. That same day, the court also entered an order which accepted and entered Mother and Father's earlier admissions[11] to the allegations of educational neglect, noted that the court would schedule a disposition hearing, and ordered the preparation of an updated predisposition study.[12]

[¶ 17] Father filed a timely notice of appeal of both orders on September 15, 2014.

## DISCUSSION

### Juvenile Court Jurisdiction

■ [¶ 18] Father directs this Court to the comment in the juvenile court's decision letter that the "educational concerns regarding the minor do appear to have been addressed." He contends that once a juvenile court makes such a finding in an educational neglect case, the legislative purpose in allowing the court to exercise jurisdiction over those proceedings has been completely satisfied, and consequently there is no longer any lawful basis for the exercise of that power or continuation of the case.

■ [¶ 19] Questions of jurisdiction and statutory interpretation are matters of

---

9. That hearing was held to determine whether the consent decree required Father to provide random urine samples as part of his treatment regimen. Except for the excerpts attached to the court's letter, the transcript of that hearing is not part of the transmitted record on appeal.

10. Father is not accused of violating any provision of the consent decree.

11. The admissions were made in the consent decree agreement and, by the terms of the agreement, they were to be given effect if they violated the decree and the court revoked it.

12. The record does not tell us what the disposition was.

law which this Court reviews de novo. In determining how the legislature intended statutes to be applied, we look first to the language it used. If the language is sufficiently clear and unambiguous, our task is to simply apply the statute's words according to their ordinary and obvious meaning. *Harmon v. Star Valley Medical Center*, 2014 WY 90, ¶¶ 14–15, 331 P.3d 1174, 1178 (Wyo.2014); *MF v. State*, 2013 WY 104, ¶¶ 6, 8, 308 P.3d 854, 857 (Wyo.2013).

[¶ 20] Father points to no ambiguity in the statutes involved in this case, and we can find none. Nor can we discern any statutory language that contains the jurisdictional limitations he proposes.

[¶ 21] The legislature endowed the juvenile court with general jurisdiction over all matters and proceedings commenced there which concern any minor alleged to be neglected, his parents, and all persons living in the same household. Wyo. Stat. Ann. § 5–8–102(a)(i), (v) (LexisNexis 2013). Coincident to those general powers in neglect cases, the juvenile court was also granted more specific jurisdiction to order any party to perform any acts, duties, or responsibilities the court deems necessary, or to order any party to refrain from any act or conduct if the court deems the conduct detrimental to the child's best interest and welfare or deems restraint of the conduct essential to enforcing any lawful court order as to the child's disposition. Wyo. Stat. Ann. § 14–3–403(a).

[¶ 22] If a neglect case proceeds to a disposition hearing, the court may, among other things, order the parents to participate in any treatment programs "designed to address problems which contributed to the adjudication." Wyo. Stat. Ann. § 14–3–429(d)(ii), (iii). Ordinarily, the juvenile court retains jurisdiction to enforce its order of disposition until the child turns eighteen, unless it terminates it earlier because it has found that the purpose of the order has been achieved and that discharge is in the child's best interest. Wyo. Stat. Ann. § 14–3–431(a), (b). Early termination is therefore a discretionary matter, and given the court's broad power to manage both the personal and familial behavioral issues that gave rise to neglect, it is evident that the phrase "purpose of the order" should embrace the resolution of all such issues. For purposes of the present case, this means that the juvenile court could permissibly retain jurisdiction, even in the face of a short-term improvement in CDR's grades, if it thought that success in the longer term might be unattainable because of the strife that would result if Mother was no longer required to attend to her drinking problem.

[¶ 23] It is true that if the consent decree had expired on July 10, 2014 without any complaint that Mother or Father had violated its terms and conditions, the juvenile court would have been compelled by the decree's terms and Wyo. Stat. Ann. § 14–3–428(c), (f), (g) to discharge them and close the case. However, those are not the facts of this case. Prior to the decree's expiration, the State moved to terminate it and reinstate the neglect proceedings because Mother allegedly violated the decree twice. In such a situation, § 14–3–428(f) empowers the juvenile court to conduct a hearing and rule on such accusations. If it finds a violation, the court may reinstate the neglect petition and proceed as if the consent decree had never been entered. That is, it may proceed to a disposition as noted above, and a finding that CDR's grades have improved does not deprive it of those powers. The court did not lose jurisdiction over this case by making the finding it did.

**Violation of the Consent Decree**

[¶ 24] Consent decrees do not result from a court's resolution of the merits of a dispute, but rather from a contractual agreement between the parties. Consequently, they should be enforced as a contract in accordance with the parties' intent. 18A Charles A. Wright, et al., *Federal Practice and Procedure: Jurisdiction* § 4443 (2d ed. updated 2015); *Local No. 93, Intern. Ass'n of Firefighters, AFL–CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 519, 106 S.Ct. 3063, 3073, 92 L.Ed.2d 405 (1986); *United States v. Northern Colorado Water Conservancy Dist.*, 608 F.2d 422, 430 (10th Cir.1979). Because a consent decree normally derives from a compromise in which the parties all give up something they might have won in litigation,

it is inappropriate for courts to search for some overriding "purpose" of the decree and construe it on that basis. Rather, it must be construed as it is written. *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 235–37, 95 S.Ct. 926, 934–35, 43 L.Ed.2d 148 (1975).

[¶ 25] In interpreting a contract, a court must attempt to ascertain the parties' intent by first looking to the specific wording of the contract. *In re Mark E. Dowell Irrevocable Trust # 1,* 2012 WY 154, ¶ 18, 290 P.3d 357, 361 (Wyo.2012). Those words must be given the plain ordinary meaning that a reasonable person would give them. *Bowers Oil and Gas, Inc. v. DCP Douglas, LLC,* 2012 WY 103, ¶ 20, 281 P.3d 734, 742 (Wyo. 2012); *Hunter v. Reece,* 2011 WY 97, ¶ 17, 253 P.3d 497, 502 (Wyo.2011). If that language is clear and unambiguous, a court must enforce the agreement according to its terms without looking beyond the four corners of the contract. *Bowers,* ¶ 20, 281 P.3d at 742; *Hunter,* ¶ 17, 253 P.3d at 502. That is, it must not look to evidence of facts extrinsic to the contract, or to rules of construction, in order to avoid or enlarge upon the parties' clearly expressed intent. The language can be deemed ambiguous only if it conveys a double, doubtful, or otherwise uncertain meaning. *Dowell,* ¶¶ 18, 22, 290 P.3d at 361.

[¶ 26] As is the case with any other contract, the juvenile court's adherence to these standards in giving meaning to the consent decree is a question of law that we review de novo. *Bowers,* ¶ 20, 281 P.3d at 741; *Hunter,* ¶ 18, 253 P.3d at 502. The record leads us to conclude that the court erred.

[¶ 27] A few salient facts described above drive our decision. The parties' contract—the consent decree agreement—did not expressly prohibit Mother from drinking, although it certainly did require her to undergo alcohol/substance abuse evaluation and "follow the regimen of treatment recommended." As already noted, the first of two evaluations, under the heading "Recommendation for Treatment," contained the following two paragraphs:

It is recommended that [Mother] engage in a level III inpatient chemical dependency treatment program.

It is furthermore recommended that she abstain from alcohol and all other mood altering substances for the remainder of her life.

The juvenile court's opinion letter expressed its reason for revoking the consent decree as follows:

The issue for this court is whether [Mother] has violated the Consent Decree. Clearly she has. This Court will decline to review definitions, the theory of treatment, or other ways to interpret the agreement. [Mother] was not to drink and everyone in the room knew that.

[¶ 28] When Father later asked the court to specify what led it to conclude that "everyone in the room knew that," and to explain its definition of the term "treatment regimen," the court simply referenced an excerpt from a transcript of a hearing held on January 14, 2014 and a November 14, 2013 MDT report which noted Father's frustration over her drinking.

[¶ 29] Taking the last points first, neither the transcript nor the report spoke to the terms of the parties' contract, and the court referred to them only for the limited purpose of illustrating that four and six months after entry of the consent decree, the court and Father expressed understandably negative feelings about Mother's drinking. Those facts extrinsic to the parties' contract say nothing about the parties' intent when the contract was formed, and in any event, they should not have been used to interpret it absent a finding by the juvenile court that the term "regimen of treatment" was ambiguous. It made no such finding.

[¶ 30] Moreover, we question the court's suggestion that, at the time the contract was drafted, "everyone in the room" knew that Mother should be prohibited from drinking. If that was the case, it would have been simple to include an express provision in the consent decree. Where a contract is silent on a particular matter that easily could have been drafted into it, a court should refrain from supplying the missing language

under the pretext of contract interpretation. *Herling v. Wyoming Machinery Co.*, 2013 WY 82, ¶¶ 35–36, 304 P.3d 951, 960 (Wyo. 2013). Courts are not at liberty to rescue parties from the consequences of a poorly made bargain or a poorly drafted agreement by rewriting a contract under the guise of construing it. *Hunter*, ¶ 23, 253 P.3d at 503.

[¶ 31] More troubling is that in the face of a missing term, the definitions of the terms that were actually used, theories of what constitutes "treatment," or other ways to interpret the agreement were not considered. This led to a failure to explore the plain meaning of the term "recommended treatment regimen" and instead to a conclusion that there was an order to abstain from drinking because one of Mother's evaluations [13] included that language in its "Recommendations for Treatment" section, along with the recommendation that she enroll in an inpatient chemical dependence treatment program. One cannot tell whether the author of that evaluation intended that recommendation to define a treatment regimen. Even if that were the case, a lifestyle recommendation provided by a stranger to a contract is a poor substitute for language in the agreement and decree that would clearly make it a requirement.

[¶ 32] Inquiries into the meaning of terms used in contracts often lead courts to the pages of a dictionary. A sampling of online dictionaries, both those concentrating on medical terminology and those of more general application, reveal remarkable similarities in meanings of the key terms "treatment" and "regimen." This is particularly evident when the more general sources are reviewed for definitions most applicable to this case.

[¶ 33] The general dictionaries define "treatment" as managing the application of medicine, surgery, etc., or as management or care by procedures intended to relieve illness. Dictionary, dictionary.reference.com/browse/treatment; Webster's Dictionary, www.webster-dictionary.org/definition/treatment. Those same sources define "regimen" as a regulated or systematic course or plan of therapy, diet, exercise, or the like to restore health. Dictionary, dictionary.reference.com/browse/regimen; Webster's Dictionary, www.webster-dictionary.org/definition/regimen. Thus, they convey the notion that a treatment regimen is a planned course of therapeutic care managed and provided by healthcare professionals.

[¶ 34] The online medical dictionaries surveyed seem to be in accord with such a definition. They define "treatment" in terms of the medically managed care of a patient to combat some disorder, or as healthcare which is intended to relieve illness or mental health problems. Medilexicon, http://www.medilexicon.com/medicaldictionary.php/treatment; The Free Dictionary, http://medical-dictionary.thefreedictionary.com/treatment. They define "regimen" as a program of treatment for therapeutic purposes or a regulated system of therapy intended to promote health. Medilexicon, http://www.medilexicon.com/medicaldictionary.php/regimen; The Free Dictionary, http://medical-dictionary.thefreedictionary.com/regimen. In short, they convey the same plain and ordinary, non-specialized meaning for the term "treatment regimen" as the general dictionaries.

[¶ 35] Perhaps the plain meaning of that term is best summed up on the website of the American Society of Addiction Medicine, which describes "treatment" as the "use of any planned, intentional intervention … designed to enable the affected individual to achieve and maintain sobriety, physical and mental health, and a maximal functional ability." ASAM, www.asam.org/for-the-public/treatment. Viewed in that light, both of Mother's evaluations issued a "recommended regimen of treatment" when they proposed that she enroll in an inpatient alcohol abuse therapy program. Although Mother's addiction is undoubtedly destructive to her family, and perhaps it can never be made whole unless she abstains, she complied with the requirement to complete the treatment recommended, although she did relapse.

---

**13.** The juvenile court did not explain why it did not consider the second evaluation as well as the first. The second evaluation was the basis for Mother's admission into an inpatient program, and it did not include an expectation that Mother would refrain from drinking for life.

[¶ 36]   On the other hand, the objective of lifelong sobriety is not a recommended regimen of treatment to which Mother was bound to adhere by the consent decree.  It is good advice, and it is a noble goal Mother should no doubt pursue, but it is not a regimen of treatment.

[¶ 37]   None of this is to suggest that juvenile courts cannot require a party to abstain from the use of alcohol or controlled substances.  This could have been simply and clearly stated:  "The parties shall not consume alcohol.  Failure to adhere to this requirement shall be a violation of the consent decree."  The flaw in the consent decree is that the parties did not agree to impose this condition on Mother, not that they could not do so.

## CONCLUSION

[¶ 38]   The juvenile court did not lose jurisdiction over the neglect case after finding that CDR's educational problems had been resolved.  However, the court erred in concluding that Mother violated the terms of the consent decree by drinking alcohol.  We therefore reverse and remand to the juvenile court with instructions to vacate the adjudication of neglect and any disposition based thereon, to discharge the parties from the consent decree, and to dismiss the case.[14]

---

**14.**  Nothing contained in this opinion should be construed to suggest that State cannot initiate other proceedings based upon other evidence of neglect, need for supervision, or delinquency.