FOX, Justice.
[¶1] Michael Paul Montano pleaded no contest to two counts of second-degree murder and guilty to two counts of mutilation of dead human bodies as part of a plea agreement. The district court accepted his pleas but rejected the agreement's joint sentencing recommendation. Mr. Montano appeals, claiming the State violated the plea agreement when it recommended the agreed-upon sentence, but made negative comments about Mr. Montano's conduct. We affirm.
ISSUE
[¶2] Did the State breach its plea agreement with Mr. Montano by commenting on the evidence?
*840 FACTS
[¶3] Jody Fortuna and Phillip Brewer travelled to Gillette, Wyoming in late August 2016, to see their friend, Michael Montano. They were unaware that, at least in Mr. Montano's mind, the friendship had soured. Several days after the Fortuna and Brewer families reported the men missing, a witness informed law enforcement that she had seen Mr. Brewer's body in the bed of Mr. Montano's pickup truck. Later that day, a deputy found the truck parked near an intersection. As he approached the truck, he "immediately detected a strong foul odor, similar to that of an animal which had been dead for quite some time." He saw dried blood on the truck's tail gate and a blue 55-gallon barrel in the backseat. A search of the truck uncovered two plastic storage totes containing several plastic garbage bags of dismembered male body parts and clothing and documents belonging to Mr. Fortuna and Mr. Brewer.
[¶4] The same day, law enforcement spoke with Mr. Montano's friend, Samson Bears. Mr. Bears reported that Mr. Montano had come to his workplace a few days earlier, asking if he could have one of his blue 55-gallon barrels. When Mr. Bears asked why he wanted one, Mr. Montano responded, "I gotta get rid of some bodies." According to Mr. Bears, Mr. Montano said he had shot Mr. Fortuna and Mr. Brewer, and one of them had "begged like a bitch." Afterwards, he cut up their bodies in his bathtub with a saw. Mr. Bears believed Mr. Montano had killed them because of a conflict over drugs and money. When Mr. Montano stabbed a plastic bag in the back of the truck, Mr. Bears "smelled a strong odor, similar to that of a deer which had been dead for a long time." Mr. Montano also told Mr. Bears that he had stored "brain matter" in a storage unit.
[¶5] Law enforcement searched Mr. Montano's trailer, a motel room where he frequently stayed, and his storage unit. At the trailer, a blood-illuminating substance revealed signs of blood in several areas of the home, and law enforcement found several patched bullet holes and a fired bullet inside one of the walls. A search of the motel room uncovered a gun lock to a Ruger firearm and a list of "cleaning supplies that could be used to clean up the scene of a murder." At the storage unit, law enforcement discovered two more plastic totes containing body parts.
[¶6] After his arrest, Mr. Montano told police he wanted the "death penalty" and that he had "never killed anybody before." He stated that he ran into Mr. Fortuna and Mr. Brewer after he had been using heroin and that they all returned to his trailer home. He claimed he had passed out and the next thing he remembered was being woken up by his girlfriend, Kylee Collins, who had found Mr. Fortuna's and Mr. Brewer's bodies in the bathtub. Mr. Montano told Ms. Collins to leave, saying that he "would take care of it." Mr. Montano said he left the bodies in the bathtub for a few days while deciding what to do and then cut them into pieces, placing the parts in plastic totes. Ms. Collins returned to the trailer home to help him clean, and the two of them drove around with the totes, looking for a place to bury the body parts. Mr. Montano initially denied shooting the men, but during a break in the interview said, "[F]*** it, I did it. I killed em." When asked to clarify the statement he again denied killing them, saying he did not remember pulling the trigger.
[¶7] Mr. Montano and the State reached a plea agreement in which they agreed to jointly recommend concurrent sentences of 51.5 years to life on two counts of second-degree murder and 2.5 years to three years on two counts of mutilation of dead human bodies. In exchange, Mr. Montano agreed to plead no contest to the four counts. At his change of plea hearing, the court asked if the families approved of the agreement. The prosecutor responded: "I don't know that you can say 'approve' ... we were advised ultimately to go forward," but that it was not possible to "fashion a sentence that's reasonable to someone who's lost a loved one." After advising Mr. Montano that the court was not a party to the agreement, and therefore not bound to its sentencing recommendation, the court accepted his pleas.
[¶8] Mr. Fortuna's and Mr. Brewer's families addressed the court at sentencing. Mr. Fortuna's mother recounted how her son and Mr. Montano had been "like brothers, not by *841 blood, but by choice." She told the court she did not believe the plea agreement was justice for either of the murdered men and "begg[ed] the Court for a harsh and just sentence." Mr. Fortuna's sister-in-law testified about the impact Mr. Fortuna's death had on his brother, who had relapsed into alcoholism and was experiencing severe health issues due to alcohol and mental and physical exhaustion. She told the court the possibility of parole was not acceptable to her family and asked it "to consider a harsher punishment of at least consecutive sentences."[1] Mr. Brewer's brother told the court that Mr. Montano's "total lack of remorse" and "disrespect for human remains" caused him to question Mr. Montano's humanity. He asked that Mr. Montano receive "the maximum amount of time allowed," one sentence for each man he murdered and mutilated, "to be served consecutively." His sister asked the court to "weigh the crimes against Phillip and Jody's lives and help our family find some peace" when considering Mr. Montano's sentence.
[¶9] After two witnesses spoke on Mr. Montano's behalf, the prosecutor addressed the court, saying he believed Mr. Montano's acts made him a "monster" and a threat to the community. He told the court he was "present to see what was inside of those totes and to smell what was inside of those totes" when law enforcement opened them, describing it as "a horrific crime." He had "a pretty clear picture" of the facts underlying the mutilation of dead bodies charges, but the second-degree murder charges had been more challenging due to conflicting witness statements and a lack of eyewitnesses. The State took those factors into consideration when reaching a plea agreement with Mr. Montano. The prosecutor also commented on Mr. Montano's presentence investigation report, saying that Mr. Montano was "no stranger to the criminal justice system" and describing some of his previous violent offenses. He then stated, "[O]bviously, the Court can still look at the sentencing criteria to determine what would be the appropriate sentence," but asked the court to "go along with the plea agreement."
[¶10] Before imposing sentence, the court again explained that, although it "more often than not" accepted proposed plea agreements, it was not bound to do so. It then rejected the plea agreement's sentencing recommendation. The court explained that the sentencing recommendation had "the notion of two for the price of one[,]" which was unacceptable because "[t]here were two separate murders [ ], two separate losses, two separate sets of victims[.]" It also explained that it viewed the mutilation charges as distinct from the murders. The court described the effects of the murders and mutilations on Mr. Fortuna's and Mr. Brewer's families as "stunning." It disagreed, however, that Mr. Montano was a "monster," saying "there's a difference between a person being a monster and a person committing monstrous acts, and I think the latter is what we're seeing here." The court then imposed sentences of 60 years to life for each murder and 2.5 to three years for each mutilation, each sentence to run consecutively.
[¶11] After the court imposed sentence, Mr. Montano's counsel made a record concerning the court's rejection of the sentencing recommendation.
[W]hen the State['s] tone at sentencing is one in which they say, well, the Court, you can do what you want to do. Oh, but we want you to impose the plea agreement. The words are that they're abiding by a plea agreement, and I wouldn't even necessarily say that they went overboard in not asking the Court to accept it, but the State's reading, he's calling Mr. Montano a monster. He's claiming other things. And I don't think ... that the State really stood by the plea agreement in spirit.
*842 The court responded that it was very uncommon for it to reject a plea agreement, but that even if the prosecutor had said nothing other than "we are arguing for imposition of the plea agreement," the sentence of the court would have been the very same. It concluded sentencing by telling Mr. Montano that it did not view him as irredeemable, saying "everybody's redeemable in my book."
DISCUSSION
The State did not breach its plea agreement with Mr. Montano by commenting on the evidence.
[¶12] Mr. Montano argues that, although the State recommended the sentence in the plea agreement, it violated the spirit of the agreement in its comments to the court. Thus, the district court should have permitted Mr. Montano to withdraw his guilty pleas or, alternatively, this Court should remand for specific performance of the agreement. The State counters that the prosecutor's comments "were merely a brief, accurate summation of the facts" that did not violate the plea agreement.
[¶13] The parties agree the question of whether the State has breached a plea agreement is a question of law we review de novo. Nordwall v. State , 2015 WY 144, ¶ 13, 361 P.3d 836, 839 (Wyo. 2015). A plea agreement is a contract between the State and the defendant to which we apply general principles of contract law. Mendoza v. State , 2016 WY 31, ¶ 26, 368 P.3d 886, 895 (Wyo. 2016) (citing Deeds v. State , 2014 WY 124, ¶ 14, 335 P.3d 473, 478 (Wyo. 2014) ). To determine whether a breach of a plea agreement occurred we:
(1) examine the nature of the promise; and (2) evaluate the promise in light of the defendant's reasonable understanding of the promise at the time the plea was entered. The prosecutor must explicitly stand by the terms of any agreement; and if the State is unable to carry out the terms, the correct remedy is withdrawal of the plea. The State may not obtain the benefit of the agreement and at the same time avoid its obligations without violating either the principles of fairness or the principles of contract law.
Mendoza , 2016 WY 31, ¶ 26, 368 P.3d at 895. As in a contract, courts will not release a party from its obligations under a plea agreement unless another party materially and substantially breaches the agreement. Browning v. State , 2001 WY 93, ¶ 32, 32 P.3d 1061, 1071 (Wyo. 2001). "A material or substantial breach is one that goes to the whole consideration of the agreement." Id. (citing Williams v. Collins Commc'n, Inc. , 720 P.2d 880, 891 (Wyo. 1986) ). When determining whether a breach is material or substantial, we examine several factors, "including the extent to which the non-breaching party will be deprived of the benefit it reasonably expected and the extent to which the breaching party's conduct comports with the standards of good faith and fair dealing." Browning , 2001 WY 93, ¶ 32, 32 P.3d at 1071.
[¶14] Our analysis begins with the terms of the agreement. Mendoza , 2016 WY 31, ¶ 27, 368 P.3d at 895. "If its language is 'clear and unambiguous, [we] must enforce the agreement according to its terms without looking beyond the four corners of the contract.' " Id. (quoting In re CDR , 2015 WY 79, ¶ 25, 351 P.3d 264, 270 (Wyo. 2015) ) (alteration in original). Here, in exchange for Mr. Montano's no contest and guilty pleas, the parties agreed to jointly recommend concurrent sentences of 51.5 years to life on the murder charges and 2.5 years to three years on the mutilation charges. The State made that recommendation. The plea agreement contains no term prohibiting the State from commenting on the evidence. However, Mr. Montano draws our attention to cases finding breaches of plea agreements, despite colorable adherence to their terms.
[¶15] In Herrera v. State , we held that a prosecutor violated a plea agreement under which the State had promised to recommend referral to the "boot camp" program, even when the prosecutor told the court the defendant's young age "demand[ed] a recommendation for boot camp." 2003 WY 25, ¶ 5, 64 P.3d 724, 726 (Wyo. 2003). Immediately following that "recommendation," the prosecutor stated: "I do that with reluctance, however, only trying to abide by the plea agreement so that we don't have to make this into *843 a further legal technicality argument." Id. (emphasis omitted). We concluded the defendant believed the boot camp recommendation "to be an integral, if not a crucial and imperative, term of the agreement reached." Id. at ¶ 13, 64 P.3d at 727. Further, we held the prosecutor's comments violated the standards of good faith and fair dealing because it was apparent that her statements "were meant to purely highlight to the district court that she in reality did not recommend" boot camp. Id. at ¶ 14, 64 P.3d at 728 (emphasis in original).
[¶16] In Ford v. State , we held a prosecutor violated a plea agreement under which the State had agreed to recommend a prison sentence suspended in favor of placement at an alternative treatment program. 2003 WY 65, ¶¶ 12, 14, 69 P.3d 407, 411 (Wyo. 2003). Every alternative treatment program refused to admit the defendant, in part because of his conduct in jail while awaiting trial. Id. at ¶ 5, 69 P.3d at 409. At sentencing, the prosecutor recommended the agreed-upon prison sentence but not its suspension. Id. at ¶ 15, 69 P.3d at 411. The prosecutor commented that the defendant's conduct made the defendant "a bad risk for anything other than the term ... of 5 to 10 at the penitentiary." Id. at ¶ 5, 69 P.3d at 410. The State argued it had fulfilled its obligations under the agreement and was not bound to recommend the suspended sentence because it was made impossible by the programs' refusal to admit the defendant. Id. at ¶ 17, 69 P.3d at 412. We found that the suspension recommendation was an integral part of the agreement and that, in the absence of an agreement to the contrary, both parties bore the risk of the defendant being denied admittance to an alternative program. Id . at ¶¶ 14, 17, 69 P.3d at 411-12. Additionally, we found the prosecutor had "violated the spirit of the agreement" by saying the defendant's behavior made him a bad risk for anything other than imprisonment because it constituted a "legal characterization of facts" and argument on their effect. Id. at ¶ 19, 69 P.3d at 412.
[¶17] These cases are distinguishable. First, the plea agreement in this case did not contain any term, let alone an "integral" one, precluding the State from commenting on Mr. Montano's presentence investigation report or the evidence against him. Instead, the agreement required the State to recommend the agreed-upon sentence, which it did. Although Mr. Montano takes issue with the State asking the court to "go along with the plea agreement," a mere lack of enthusiasm for a sentencing recommendation is "not tantamount to an argument that the recommendation should be disregarded." United States v. Hand , 913 F.2d 854, 857 (10th Cir. 1990). Like the prosecutor here, the prosecutor in Hand reminded the district court that it could "make its own conclusion" in sentencing the defendant before making the recommendation agreed upon in the plea agreement. Id. at 856. The appellate court commented that it "was unnecessary and probably imprudent" to remind the sentencing court of its authority to reject the recommendation but held that it did not constitute a breach of the agreement. Id. at 857. We agree. Although "unnecessary and probably imprudent" to remind the district court of its sentencing authority, the prosecutor's comments did not ask the court to ignore the State's sentencing recommendation, as the prosecutor effectively did in Herrera .
[¶18] Similarly, "[e]fforts by the State to provide relevant factual information are not tantamount to taking a position on the sentence and will not violate a plea agreement." Clingman v. State , 2001 WY 46, ¶ 7, 23 P.3d 27, 29 (Wyo. 2001). In Clingman , we found no error when the prosecutor, who had agreed not to argue for any particular sentence, stated that the defendant's presentence investigation report recommended incarceration because he was "only repeating a recommendation that had been made in a document before the district court." Id. at ¶ 9, 23 P.3d at 29 ; see also Hand , 913 F.2d at 857 (saying sentencing courts "must be permitted to consider any and all information that reasonably might bear on the proper sentence" and that prosecutors generally "must bring all relevant facts to the judge's attention") (internal citations omitted). Unlike in Ford and Herrera , there was no effort to persuade the court to reject the recommendation. See also Hand , 913 F.2d at 856 n.3 ("Merely eliciting factual information or challenging evidence presented by a defendant *844 ... is not necessarily an improper attempt to persuade or convince the sentencing judge to reject the promised recommendation.") cf. United States v. Brye , 146 F.3d 1207, 1211 (10th Cir. 1998) (The government breaches an agreement when "it makes statements that do more than merely state facts or simply validate facts found in the Presentence Report[.]") (alteration omitted). Instead, the State accurately presented its reasons for entering into the agreement, the nature of Mr. Montano's crimes, and his criminal history. Finally, although the prosecutor described Mr. Montano as a monster, he made no argument concerning the effect of that opinion on Mr. Montano's sentence. In any event, the district court rejected that characterization, foreclosing any argument that it impacted the court's decision.
[¶19] The State did not breach the plea agreement,[2] and we therefore affirm.

Mr. Fortuna's mother and sister-in-law, perhaps referring to the possibility of credit for good time, believed Mr. Montano would become eligible for parole after serving approximately 33 years. ("My son will not return in 33 years."; "[T]he 33-year plea bargain is no justice. Jody does not get to come back to us in 33 years."). The prosecutor informed the court that the plea agreement was for a significantly higher number than 33 years, stated that any issue of parole eligibility would "be taken up by the parole board if they deem fit," and accurately described the sentencing recommendation contained in the plea agreement.

Mr. Montano also criticizes unnecessary "details" in the State's affidavit of probable cause and its statement that the victims' families had advised it to go forward with the plea agreement because the affidavit "had a tremendously negative impact on the families" and their testimony showed "they were undeniably against the agreement and the recommendation." However, he does not and cannot argue the families' comments could have constituted a violation of the plea agreement. See generally Wyo. Stat. Ann. §§ 1-40-203(xiv), 7-21-103 (LexisNexis 2017) (conferring on victims the right to be notified of the opportunity to make a victim impact statement for use in a defendant's presentence investigation report and at sentencing).