2015 WY 80

**CL, Appellant (Defendant),**

v.

**ML, Appellee (Plaintiff).**

**No. S–14–0229.**

Supreme Court of Wyoming.

May 29, 2015.

Representing Appellant: Kenneth S. Cohen, Cohen Law Office, P.C., Jackson, Wyoming.

Representing Appellee: Pro se.

Guardian Ad Litem: Jean A. Day, Jean Day Law Office and Mediation, Jackson, Wyoming.

Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.

BURKE, Chief Justice.

[¶ 1] The district court issued an order granting ML (Father) visitation with his five-year-old daughter, ZGL. CL (Mother) challenges that order in this appeal. We affirm.

## ISSUES

[¶ 2] Mother presents the following issues:

1. Whether the district court abused its discretion by excluding testimony relating to alleged incidents of domestic abuse.
2. Whether the district court erred in ordering that the minor child could not leave Teton County without the consent of both parents.

## FACTS

[¶ 3] The parties began dating in 2007. Mother became pregnant in 2008 and gave birth to a daughter, ZGL, in 2009. The parties never married and they separated approximately six months after their daughter was born. Mother resides in Teton County. Father resides in Jackson, Wyoming from June through September, and in Las Vegas, Nevada from September to June. In January 2011, Father filed a petition to establish paternity, custody, and visitation with ZGL. In the petition, Father requested joint legal custody of ZGL, and "such physical custody arrangements and visitation as may be in the best interests of the child." Mother answered and requested that the district court enter an order awarding her primary physical custody and granting visitation to Father.

[¶ 4] In May 2011, Mother filed a motion for a temporary restraining order in which she asserted that Father had verbally abused and threatened her. The district court entered an order enjoining the parties from threatening each other and from engaging in non-consensual physical contact. In June, Mother alleged that Father had physically and sexually abused ZGL. Mother subsequently filed a motion for an order requiring Father to complete a psychological evaluation and parenting assessment. In that motion, Mother asserted that she "continues to have difficulty with [Father] due to his aggressive behavior and physical abuse in the presence of the parties' daughter." Following a hearing, the district court ordered Father to complete an anger assessment evaluation and ordered both parties to obtain parenting as-

sessments. The assessment recommended that Father attend counseling and that he avoid all unnecessary contact with Mother.

[¶ 5] On February 20, 2012, Father was arrested and charged with a domestic violence battery, following an altercation with Mother when the parties were exchanging ZGL. Father subsequently pled no contest to a charge of unlawful contact. On February 28, the Teton County Circuit Court issued a protection order finding that an act of domestic abuse, as defined by Wyo. Stat. Ann. § 35–21–102(a)(iii), had occurred. The order awarded Mother temporary custody of ZGL and denied Father visitation.

[¶ 6] Shortly thereafter, the district court held a hearing on Mother's renewed motion for psychological evaluations and parenting assessments and Mother's motion for an order to show cause as to why Father should not be found in contempt of court for violating the court's restraining order. Following the hearing, the district court ordered each party to submit to a psychological evaluation and parenting assessment by Dr. Steven Nelson. The court further ordered that Father would be allowed to have supervised visitation with ZGL upon his return to Jackson in May.

[¶ 7] Dr. Nelson completed his parenting assessments in February 2013. He based his assessments on multiple interviews and supervised visitations with the parties over a period of several months, as well as visits with ZGL and interviews with the parties' friends and therapists. He also reviewed police records relating to Father's arrest in February 2012 and Mother's victim impact statement relating to that incident. In his assessment, Dr. Nelson noted that "The greatest risk factor in the present case seems to be parental conflict, as addressed elsewhere in this report. However, there is also a history of allegations of abusive behaviors levied toward [Father], suggesting that he has physically and/or sexually abused [ZGL] in the past." Dr. Nelson noted that these allegations had been investigated by the Department of Family Services and that the Department had indicated that there was "no apparent evidence to substantiate any reported abuse." He further noted that ZGL had

been seen by a pediatrician who found "no evidence of either physical or sexual abuse" and that the pediatrician had determined that ZGL's "reported regressive behaviors following her visits with her father were consistent with a child who has had little contact with him and who struggles to cope with transitions."

[¶ 8]   As a result of the fact that the allegations of child abuse had been "repeatedly reported, investigated, and found unsubstantial by the Department of Family Services, law enforcement, and the Teton County Child Protection Team," Dr. Nelson determined that "the risk for abuse while in [Father's] care is minimal." He concluded as follows:

> This investigation has yielded information that this examiner believes is crucial to the development of a custody and visitation plan for [ZGL]. Both [Father] and [Mother] were noted to be loving and caring parents, and their genuine desire to participate in [ZGL's] life is appreciated by the examiner. However, there are significant concerns that were raised about each parent by the other, and these concerns need to be considered in the determination of a visitation plan. It is believed that [ZGL] has suffered considerably in the wake of this highly conflicted battle between her parents.
>
> The current situation is one of great concern for the examiner. The potential for conflict is severe, and allegations of abuse must always be taken seriously. However, false allegations or over-interpretations of risk or danger on the part of one parent toward the other are also very damaging, given their impact upon the relationship the accused parent has with the child and the carryover effect that can be experienced by the child in future relationships. Therefore, the examiner has been very careful to follow up on concerns of abuse both to protect [ZGL] in the event they are true, and to ensure that false assumptions about abuse do not pose a factor in recommendations for visitation. After careful procedure, the examiner has concluded that the lack of substantiation of abuse indicates that the accusations lack appar-

ent validity. Concerns still exist given [ZGL's] statements to various people that she wants to be protected from "Papa"; however, this clear connection between [ZGL's] apparent anxiety in unfamiliar settings and fears of being harmed by her father have not been witnessed by this examiner, nor have they been noted by anyone outside of [Mother] and her close group of acquaintances. Furthermore, this examiner and [Father's] therapist both noted that [ZGL] demonstrated very comfortable behavior while with her father in supervised visitation.

Based on his assessment, Dr. Nelson recommended that Father's visitation with ZGL be supervised by a professional counselor until the counselor determined that supervision was no longer necessary.

[¶ 9]   In May 2013, an officer with the Jackson Police Department issued a supplemental report regarding the officer's investigation into Mother's allegations of child abuse. The report stated as follows:

> Following the forensic interview that I did with [ZGL], her mother [CL] brought numerous video recordings to the police department that she had taken of [ZGL], allegedly from in the middle of the night following [ZGL] having a nightmare(s).
>
> It appeared from listening to the audio and watching the video that [ZGL] would wake up and [Mother] would be "right there" in her face, recording her saying things to [ZGL] like, "did you have a bad dream.... Tell me about your bad [dream]."
>
> I found the recordings to be very disturbing and possibly emotionally abusive to [ZGL]. I explained to [Mother] that I thought what she was doing was very unhealthy for her daughter as [ZGL] would wake up to a video camera in her face and her mom putting thoughts into her head. I made it very clear to [Mother] that I felt her behavior was inappropriate and she appeared to understand. I explained that this case would be forwarded to the [Teton County Sheriff's Office] and should they feel additional follow-up be conducted [then] they would be the agency that would be conducting it, although I made it clear that based on my interview I did not have

probable cause to believe that [ZGL] was the victim of a sexual assault.

Two weeks later, an officer with the Teton County Sheriff's Office also issued a supplemental report regarding Mother's allegations of child abuse. The officer noted that "it appears [Mother] may be harming [ZGL] by the videos of nightmares and discussing things her father has done to 'hurt her.'" The officer concluded that "It appears to me, [Mother] may be talking to [ZGL] and possibly training or coaching her on things to say to authorities." The officer noted that the case had been closed and that the report was for information purposes only, but that "Based on the information from investigating this case, there is no indication that an actual crime has occurred between [Father] and [ZGL]."

[¶ 10] In June 2013, the parties entered into a settlement agreement providing that the parties would have joint legal custody of ZGL and providing for Father's visitation in accordance with Dr. Nelson's recommendations. Pursuant to the agreement, Mother was granted primary physical custody of ZGL subject to Father's supervised visitation during the summer of 2013. Father's visitation was to be supervised by a professional counselor until the counselor determined that supervision was no longer necessary. During the winter, when Father resided in Las Vegas, he was granted two six-hour visits during any trip to Jackson. The agreement further provided that the parties were to negotiate a new visitation schedule perennially in April, until the parties reached a permanent schedule. On June 20, 2013, the district court entered an order adopting the terms of the settlement agreement.

[¶ 11] In November 2013, Mother traveled to Pittsburgh, Pennsylvania with ZGL to visit her family and did not return to Jackson until June 2014. While Mother was in Pittsburgh, ZGL began participating in counseling with Dr. Dianne Jandrasits, a clinical psychologist. Mother did not tell Father that she was traveling to Pittsburgh or that ZGL was participating in counseling with Dr. Jandrasits. During sessions with Dr. Jandrasits, ZGL indicated that Father had "touched her privates." Dr. Jandrasits made

a report to the Wyoming Department of Family Services, and the Teton County Sheriff's Office initiated another investigation into the allegations of abuse. Dr. Jandrasits was not provided with Dr. Nelson's psychological evaluations of the parties or his February 2013 parenting assessments. Due to the investigation by the Teton County Sheriff's Office, Mother did not participate in the creation of a new visitation schedule for the summer of 2014.

[¶ 12] In May 2014, Father filed a "Motion for a Status Review Hearing and a Request for Immediate Relief to Establish Visitation with His Child." Father asserted that no visitation with ZGL had been scheduled for the upcoming summer in contravention of the parties' agreement to establish a visitation schedule in April. Father subsequently submitted an affidavit stating that the Teton County Sheriff's Office had closed its investigation into the allegations of child abuse after finding no evidence to substantiate the allegations.

[¶ 13] The district court held a hearing on Father's motion on July 2, 2014. At the hearing, the district court informed the parties that the purpose of the hearing was to determine visitation, and not to hear evidence relating to alleged incidents of domestic abuse. However, the court allowed Mother to submit an offer of proof regarding alleged incidents of domestic abuse between the time of Mother's pregnancy and Father's arrest in 2012. The district court also heard testimony from Dr. Jandrasits regarding the statements made by ZGL in counseling.

[¶ 14] Following the hearing, the district court issued an order finding that "[Mother] has unreasonably denied, and she has unjustifiably interfered with, [Father's] joint legal custodial rights, visitation rights, and communication rights with ZGL" and that Mother's conduct was not in the best interests of ZGL. The court's order established a graduated visitation schedule. Pursuant to the order, Father was granted visitation, to be supervised by a professional counselor until the counselor determined that supervision was no longer necessary. During the period of supervised visitation, ZGL was to remain in Teton County unless the parties agreed

otherwise. After completing a period of unsupervised visitation, Father was given the right to overnight visits with ZGL. Mother timely appealed the district court's order.

## STANDARD OF REVIEW

[¶ 15] As a general matter, we review decisions relating to visitation for an abuse of discretion. "The trial court has discretion in determining custody and visitation issues to be in the best interests of the children: 'Custody, visitation, child support, and alimony are all committed to the sound discretion of the district court.'" *Arnott v. Arnott,* 2012 WY 167, ¶ 11, 293 P.3d 440, 444 (Wyo.2012) (quoting *Zupan v. Zupan,* 2010 WY 59, ¶ 12, 230 P.3d 329, 333 (Wyo.2010)). In the present case, Mother challenges the district court's decision to exclude testimony regarding incidents of domestic abuse. We review that decision for an abuse of discretion:

> A trial court's rulings on the admissibility of evidence are entitled to considerable deference, and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal. The appellant bears the burden of showing an abuse of discretion. Even when a trial court errs in an evidentiary ruling, we reverse only if the error was prejudicial. The appellant must show a reasonable probability that, without the error, the verdict might have been different.

*Wise v. Ludlow,* 2015 WY 43, ¶ 42, 346 P.3d 1, 12 (Wyo.2015) (quoting *Glenn v. Union Pacific R.R. Co.,* 2011 WY 126, ¶ 12, 262 P.3d 177, 182 (Wyo.2011)). We review questions of law de novo. *Arnott,* ¶ 11, 293 P.3d at 444.

## DISCUSSION

[¶ 16] In her first issue, Mother contends the district court erred by failing to consider testimony relating to alleged incidents of domestic abuse and child abuse in determining the best interests of ZGL. She claims the court erred in excluding testimony relating to particular instances of domestic abuse occurring prior to June 2013, including

the incident for which Father was arrested in 2012. She also asserts the district court erred by failing to consider Dr. Jandrasits' testimony relating to possible child abuse. Mother claims that these actions are contrary to Wyo. Stat. Ann. § 20–2–201(c) (LexisNexis 2013), which provides that "The court shall consider evidence of spousal abuse or child abuse as being contrary to the best interest of the children. If the court finds that family violence has occurred, the court shall make arrangements for visitation that best protects the children and the abused spouse from further harm." Mother contends that, as a result, we must reverse the district court's order. We do not agree.

[¶ 17] With respect to the incidents of domestic abuse alleged to have occurred prior to June 2013, the district court found as follows:

> The Settlement Agreement was [executed on] June 13, 2013[;] the orders that followed that Settlement Agreement were entered and I found ... that the Settlement Agreement conformed to the best interests of the child considering all the history that had gone on leading up to that Settlement Agreement.... I expressly found that this Settlement Agreement promoted the best interests of the child given everything that had occurred up to that point in time that I was aware of in the court file and I read all this stuff about domestic abuse and I heard it all.

The district court stated that "in light of the Settlement Agreement, in light of the Court's order adopting the Settlement Agreement finding it's in the best interests of the child ... I think the adequate protections are built in." Ultimately, the district court ordered a graduated visitation plan similar to the schedule of visitation set forth in the parties' 2013 settlement agreement.

[¶ 18] The record in this case reveals that each of the incidents of abuse alleged by Mother in her offer of proof occurred prior to June 2013, when the parties entered into the settlement agreement.[1] Mother had the op-

---

1. Mother's offer of proof alleged the following events:

1. In December 2008, when Mother was pregnant with ZGL, the parties got into an argument in a public park. According to Mother,

portunity to present, and did present, those claims to the district court prior to entry of the settlement agreement and the order approving that agreement. The court took those allegations into account in determining that the parties' settlement agreement promoted the best interests of ZGL. Mother acknowledges that "There was no evidence of domestic violence between Father and Mother after June 2013 because the Circuit Court's no contact order prevented contact between the parties." In light of these facts, we find no abuse of discretion in the district court's decision to exclude testimony relating to particular incidents of domestic abuse that occurred prior to entry of the settlement agreement.

[¶ 19] Mother also contends that the district court erred by failing to consider Dr. Jandrasits' testimony regarding the possibility of Father's abuse of ZGL. As indicated above, Dr. Jandrasits testified that ZGL reported during counseling that Father had "touched her privates." However, she was unable to testify regarding any specific incident of abuse. Dr. Jandrasits acknowledged that she had "no idea" whether Father had abused ZGL and stated that it was not her role to determine whether abuse had occurred. Notably, she also acknowledged that she had not been provided with Dr. Nelson's psychological evaluations of Mother and Father or his parenting assessment noting that allegations of child abuse had been "repeatedly reported, investigated, and found unsubstantial by the Department of Family Services, law enforcement, and the Teton County Child Protection Team," and concluding that "the lack of substantiation of abuse

indicates that the accusations lack apparent validity."

[¶ 20] We find no support for Mother's claim that the district court failed to consider Dr. Jandrasits' testimony. The court permitted Dr. Jandrasits to testify at the hearing and noted in its order that "Family abuse and/or child abuse is a factor in formulating this visitation and communication plan." Further, we note that the schedule of graduated visitation ordered by the district court was consistent with Dr. Jandrasits' recommendations at the hearing. When she was asked whether visitation would promote ZGL's best interests, Dr. Jandrasits stated as follows:

I do feel like if there were someone that she could have visits with that was present that she felt safe with and was a trusted party, like I don't know if there's someone that exists that both parents would trust, if it were a professional, someone that she would build a relationship with, you know, prior to doing those visits ... who could then judge what her behavior is, you know, on the visits themselves, but that's in my, like, thinking about how to help a child adjust to circumstances like that or changing—it's often like I said, kids take cues from—I did say their parents, from adults that they trust, so if there could be a party that she trusts, whether professional or not, that could be present to facilitate like those visits and perhaps, you know, perhaps a professional would be helpful in order to make assessments of whether that continues to be needed, but I do think initially she seems—it does seem like for her to feel safe it might require having another party present.

Father "put his hands on [Mother's] shoulders and was violent."

2. In May 2009, the parties got into an argument at home. When Mother indicated that she was leaving with ZGL for the night, Father "pinned her up against the wall yelling at her and would not allow her to leave."

3. In February 2010, while the parties were on a trip to Hawaii, Father called Mother obscene names, "yelled at his daughter to stop crying, forcibly pinned her down on the bed as a means of putting her to sleep, threw the TV channel changer, the clicker across the room, charged at [Mother] and threatened her among other things."

4. In April 2011, Mother drove to Las Vegas so ZGL could visit with Father. On the morning before his visitation was to occur, Father arrived at the campground where Mother was staying and "started screaming at [Mother]."

5. The following day, when Mother arrived at Father's house, Father yelled obscenities at Mother and raised his fist over her head.

6. In February 2012, while exchanging ZGL for Father's visitation, Father yelled at Mother and pushed her. Father pulled Mother's ski hat off and threw it. Father was arrested and charged with a domestic violence battery.

The district court clearly considered this testimony when it ordered a schedule of supervised visitation with a professional therapist. Accordingly, we find no indication that the district court did not consider Dr. Jandrasits' testimony in determining the best interests of ZGL.

[¶ 21] In her second issue, Mother claims the district court erred by ordering that ZGL could not leave Teton County without the agreement of both of the parties. The court's order provides that "For only so long as supervised visitation continues, ZGL shall remain in Teton County, Wyoming, absent mutual written agreement to remove the child from Teton County, Wyoming, or absent this Court's written Order." Mother contends that this restriction impermissibly infringes upon her constitutional right to travel. Father responds that supervised visitation was scheduled to end on December 24, 2014, and that, as a result, the travel restriction is no longer in effect. Accordingly, he asserts that Mother's challenge to the travel restriction is moot. Father also claims, however, that his right to maintain a relationship with his daughter outweighs Mother's right to travel during the time that supervised visitation is required.

[¶ 22] As we have previously stated, "[A]n issue is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." *White v. Shane Edeburn Constr., LLC*, 2012 WY 118, ¶ 13, 285 P.3d 949, 953 (Wyo.2012). We have set forth basic principles of the mootness doctrine as follows:

> Our general law on justiciability provides that courts should not consider issues which have become moot. *Gulf Oil Corp. v. Wyoming Oil and Gas Conservation Comm'n*, 693 P.2d 227, 233 (Wyo.1985). We do not decide cases when a decision will have no effect or pertains only to matters that might arise in the future. *McLain v. Anderson*, 933 P.2d 468, 472 (Wyo.1997). A case is moot when the determination of an issue is sought which, if provided, will have no practical effect on the existing controversy. *Id.* Therefore, if events occur during the pendency of an appeal that cause a case to become moot or

> make determination of the issues unnecessary, we will dismiss it. *Id.; see also Rocky Mountain Helicopters, Inc. v. Air Freight, Inc.*, 773 P.2d 911, 924–25 (Wyo. 1989).

*White*, ¶ 13, 285 P.3d at 953 (quoting *In re SNK*, 2003 WY 141, ¶ 18, 78 P.3d 1032, 1037 (Wyo.2003)).

[¶ 23] Mother claims that, at the time of the hearing in this case, she was "contemplating taking ZGL back to the Pittsburgh area for the winter months." However, she does not allege that she attempted to travel, or was prevented from traveling, with ZGL during the period of Father's supervised visitation. She does not claim she attempted to reach an agreement with Father with respect to any travel arrangements with ZGL. More importantly, however, Mother does not dispute Father's claim that supervised visitation has ended, and that the travel restriction is no longer in effect. Consequently, to the extent any justiciable controversy existed with respect to Mother's right to travel, a decision with respect to this issue will have no effect on that controversy. Accordingly, we conclude that the issue of whether the court's order violated Mother's constitutional right to travel is moot and, as a result, we decline to review this issue.

[¶ 24] Affirmed.