BOOMGAARDEN, Justice.
[¶1] Appellants, Dustin and Lonnie Schell (collectively, "Buyers"), purchased a residential property from Appellees, Dustin and Lance Scallon (collectively, "Sellers"). The purchase contract for the property required, "Seller to complete a fully functional water well prior to closing." Buyers alleged Sellers failed to comply with that requirement and breached the contract. After a bench trial, the district court entered judgment in favor of Sellers. We affirm.
ISSUES
[¶2] We consolidate and rephrase the issues in this case as follows:
1. Did the district court err when it ruled that Sellers completed a fully functional well by closing and, thus, did not breach the purchase contract?
2. Did the district court commit reversible error by excluding particular testimony or exhibits offered by Buyers?
FACTS
[¶3] Prior to listing their residential property for sale, Sellers obtained water by hauling it to a cistern on the property, but they understood potential buyers may not be able to obtain financing to purchase a property that lacked its own water supply. Sellers consequently decided to drill a water well, and around the end of January 2015, Sellers contracted with Stan Davis to drill the well. Sellers obtained a groundwater permit from the State Engineer's Office in February, and Mr. Davis began drilling in March.
[¶4] Sellers listed the property for sale about a month after contracting with Mr. Davis. On March 1, 2015, Buyers offered to purchase the property. Buyers used a standard Wyoming Association of Realtors form for their proposed purchase contract. Buyers supplemented the form's boilerplate language with four "additional provisions," one of which required, "Seller to complete a fully functional water well prior to closing." Buyers did not request any other terms or conditions be included related to drilling the well, and the contract did not reference any standards or performance specifications for the well other than being "fully functional." Sellers responded with a counter-offer that included the well requirement, unamended, and Buyers accepted the counter-offer three days later.
[¶5] The parties initially scheduled the closing date for June 1, 2015, but at Buyers' request, the parties moved up the date to May 11th, and then again to April 27th. Despite the expedited timeframe, Mr. Davis completed the well and installed a pump on April 10, 2015. Sellers used the well prior to closing and did not have any issues with the *883 well or the taste, clarity, or quantity of water from the well. At the time of closing, Sellers believed the well was fully functioning.
[¶6] Buyers did not inspect the well prior to closing, other than obtaining a water sample that passed their lender's required test. Buyers moved into the home on the day of closing. Around the time of closing, Sellers requested that Mr. Davis install a deeper, more powerful pump, at no charge to Buyers, to help the well function better during drought conditions. Buyers consented, and Mr. Davis returned to the property after the closing and installed the new pump.
[¶7] Buyers began experiencing problems with the well over the next several months, including discolored water, algae, and silt clogging water filters and appliances. At Buyers' request, Mr. Scallon returned to the property on a few occasions to install landscaping and to help Buyers fix a problem with the booster pump, which was separate from the well and moved water from the cistern into the home. The district court judge heard conflicting testimony at trial on whether Buyers informed Mr. Scallon about their concerns with the well during that time.
[¶8] In March 2016, Buyers sought advice about killing the algae in their water system from Cliff Ruby, a licensed well driller. He recommended applying chlorine tablets in the well casing and cistern, but that did not end the problem. The well quit working on June 27, 2016, prompting Buyers to have their well inspected and to contact Mr. Ruby again. The well's pump and tubing were pulled, and Josh Cowan with Windcreek Services lowered a camera down the well and made a video recording. Following the inspection, Buyers accepted Mr. Ruby's recommendation and had Mr. Ruby plug the well and drill a new one.
[¶9] Buyers initiated this action against Sellers in December 2016, raising claims of fraud, negligence, and breach of contract. The fraud and negligence claims were dismissed on summary judgment and are not part of this appeal. The district court conducted a bench trial on the breach of contract claim. Witnesses at the trial included Dustin Schell, Dustin Scallon and his wife, Danielle, and representatives of the companies that helped with Buyers' post-closing well inspection. Buyers also called Mr. Ruby as an expert witness. He testified that he found problems with the well's construction when he viewed the downhole video and later plugged the well in June 2016. He testified that he thought the video showed a hole in the casing but admitted he did not know when that hole was created. Mr. Ruby also opined that the well did not comply with the State Engineer's minimum construction standards for water wells or with common industry practices. Mr. Ruby opined that the well was not functional when he observed it, but later admitted that he believed a well could still be functional even if it did not comply with the minimum construction standards.
[¶10] After trial, the district court ruled that Buyers did not satisfy their burden of proof and concluded that Sellers had completed a fully functioning water well prior to closing. The district court entered judgment in favor of Sellers, stating:
In this case, the Plaintiffs' real estate agent added the language requiring the water well. That language did not require a well that produced a certain amount of water. It did not require a well that produced water of a certain quality (although the evidence established that the one test of the water that the Plaintiffs' real estate agent performed showed the water to be satisfactory). The contract did not require that the well meet certain minimum engineering standards. The contract did not require that the well produce water for a certain period of time.
Based upon the totality of the evidence, the Court concludes that the well was fully functional as of the date of closing. It produced sufficient water for a single family residential dwelling, which was the purpose of the contract. Although the Court considered the expert testimony, that testimony established that the well, as constructed, could function. While it may have been a "marginal" well, the well was a fully functional water well for at least a couple of weeks after closing. Any warranties beyond the well functioning at the time of closing would have been subsumed by the contract's right to inspect and the "as is"
*884 clause. See Rogers v. Wright , 2016 WY 10, ¶ 38, 366 P.3d 1264, 1277 (Wyo. 2016).
Buyers appealed the district court's judgment.
STANDARD OF REVIEW
[¶11] After a bench trial, we review the trial court's findings of fact for clear error and its conclusions of law de novo. Moore v. Wolititch , 2015 WY 11, ¶ 9, 341 P.3d 421, 423 (Wyo. 2015) (citing Clark v. Ryan Park Prop. & Homeowners Ass'n , 2014 WY 169, ¶ 6, 340 P.3d 288, 289 (Wyo. 2014) ). A trial court's rulings on the admissibility of evidence are within its sound discretion and we will not disturb those rulings absent a clear abuse of discretion. Black Diamond Energy, Inc. v. Encana Oil & Gas (USA) Inc. , 2014 WY 64, ¶ 34, 326 P.3d 904, 913 (Wyo. 2014) (citing City of Gillette v. Hladky Constr., Inc. , 2008 WY 134, ¶ 84, 196 P.3d 184, 211 (Wyo. 2008) ).
DISCUSSION
[¶12] This case involves the water well Sellers paid to have drilled on their property. It does not include causes of action against the well driller or involve the agreement between Sellers and the well driller. Buyers allege Sellers breached the contract to purchase the property by failing to complete a fully functional water well prior to closing. The parties disagree about the meaning of that contract requirement and whether Sellers satisfied it.
I. Interpretation of the Purchase Contract
[¶13] According to Buyers, a "fully functional water well" means a well that produces a suitable quantity and quality of water for domestic use for the reasonable life of the well, a period which Buyers also assert must be longer than just the time between the well's completion and the date of Buyers' closing. Buyers also argue the well could not be considered "fully functional" under the purchase contract because it did not meet the State Engineer's Office's Water Well Minimum Construction Standards or the industry standards that Mr. Ruby testified about at trial.
[¶14] Sellers counter that we must interpret the contract as a whole, reading the well requirement in the context of other provisions, such as the contract's disclaimer, inspection, and "as is" clauses. Sellers also argue the district court properly analyzed the contract and they endorse the court's conclusions. The district court determined in its written judgment that the contract did not require the well to produce a certain amount of water, produce water of a certain quality, produce water for a certain period, or to meet certain minimum engineering standards. The court also determined that the contract's right to inspect and "as is" clause subsumed any warranties beyond the well functioning at the time of closing.
[¶15] The interpretation of the purchase contract is a question of law we review de novo. Pope v. Rosenberg , 2015 WY 142, ¶ 21, 361 P.3d 824, 830 (Wyo. 2015) (citing Hofhine v. Hofhine , 2014 WY 86, ¶ 8, 330 P.3d 242, 245 (Wyo. 2014) ). The fundamental goal of contract interpretation is to determine the parties' intent. James v. Taco John's Int'l, Inc. , 2018 WY 96, ¶ 11, 425 P.3d 572, 577 (Wyo. 2018) (quoting Pope , ¶ 20, 361 P.3d at 830 ). "[W]e interpret a contract as a whole, reading each provision in light of all the others to find their plain meaning." Claman v. Popp , 2012 WY 92, ¶ 28, 279 P.3d 1003, 1013 (Wyo. 2012) (citations omitted). We afford the contract's terms the plain meaning that a reasonable person would give to them. James , ¶ 11, 425 P.3d at 577 (quoting Hunter v. Reece , 2011 WY 97, ¶ 17, 253 P.3d 497, 502 (Wyo. 2011) ). "We employ common sense and 'ascribe the words with a rational and reasonable intent.' " Id. (quoting Ultra Res., Inc. v. Hartman , 2010 WY 36, ¶ 22, 226 P.3d 889, 905 (Wyo. 2010) ). "We consider the language in the context in which it was written, looking to the surrounding circumstances, the subject matter, and the purpose of the agreement to ascertain the intent of the parties at the time the agreement was made." P & N Investments, LLC v. Frontier Mall Assocs., LP , 2017 WY 62, ¶ 19, 395 P.3d 1101, 1106 (Wyo. 2017) (quoting *885 Comet Energy Servs., LLCv. Powder River Oil & Gas Ventures, LLC , 2010 WY 82, ¶ 13, 239 P.3d 382, 386 (Wyo. 2010) ). "We presume each provision in a contract has a purpose, and we avoid interpreting a contract so as to find inconsistent provisions or so as to render any provision meaningless." Claman , ¶ 28, 279 P.3d at 1013 (citing Scherer v. Laramie Reg'l Airport Bd. , 2010 WY 105, ¶ 11, 236 P.3d 996, 1003 (Wyo. 2010) ).
[¶16] When the contract's provisions are clear and unambiguous, we look only to the "four corners" of the document to determine the parties' intent and we enforce the terms of the contract as written. Claman , ¶ 26, 279 P.3d at 1013 (quoting Hunter , ¶ 17, 253 P.3d at 502 ). "An ambiguous contract is one which either contains a double meaning or is obscure in its meaning because of indefiniteness of expression." Hopkins v. Bank of the West , 2013 WY 129, ¶ 13, 311 P.3d 151, 155 (Wyo. 2013) (citation omitted). Whether a contract is ambiguous is a matter of law, and the parties' disagreement as to a contract's meaning does not mean the contract is ambiguous. Claman , ¶ 27, 279 P.3d at 1013 (citing Ultra Resources, Inc. , ¶ 23, 226 P.3d at 905 ). "Because we use an objective approach to interpret contracts, evidence of the parties' subjective intent is not relevant or admissible in interpreting a contract." Id. (citing Hunter , ¶ 16, 253 P.3d at 501 ).
[¶17] We are sympathetic to Buyers' argument that a well should not be considered "fully functional" if, as evidence indicates occurred in this case, the well begins having serious problems within months of its completion and then fails completely after a little more than a year. However, the obligation to define what constitutes a "fully functional water well" falls on the parties to the contract. In this case, the contract simply does not define functionality as Buyers suggest.
[¶18] The language setting forth the well requirement is concise: "Seller to complete a fully functional water well prior to closing." Neither party alleges the terms of the requirement are ambiguous. Buyers describe the well requirement as "an express promise to furnish an improvement which would be of a particular condition or quality" and argue that a "fully functional" well means "a good well, a long-lasting well, a defect-free well; there is nothing ambiguous about this." The contract, however, does not define "fully functional" or specify that the parties intended the phrase to incorporate particular specifications or performance measures. We therefore read the provision using the common meanings of its operative terms:
Complete : to bring to an end; to make whole or perfect.
Fully : in a full manner or degree; completely.
Functional : performing or able to perform a regular function.
Well : a pit or hole sunk into the earth to reach a supply of water.
Prior to : in advance of; before.
Merriam-Webster's Collegiate Dictionary 254, 506-07, 988, 1420 (11th ed. 2003); see Gumpel v. Copperleaf Homeowners Ass'n, Inc. , 2017 WY 46, ¶ 35, 393 P.3d 1279, 1292 (Wyo. 2017) ; Pope , ¶ 28, 361 P.3d at 832. Under the plain meaning of its terms, we conclude the well requirement is unambiguous and did not require Sellers to complete a well, before the date of closing, with any greater function than producing water. The parties were free to define "fully functional" or the requirement's other terms, but did not, and we will not write terms into a contract under the guise of contract interpretation. Gumpel , ¶ 42, 393 P.3d at 1293-94 (quoting In re CDR , 2015 WY 79, ¶ 30, 351 P.3d 264, 270-71 (Wyo. 2015) ).
[¶19] This conclusion is bolstered when we interpret the well requirement in the context of the purpose and other provisions of the contract as a whole. See P & N Investments, LLC , ¶ 19, 395 P.3d at 1106 ; Claman , ¶ 29, 279 P.3d at 1013. Given that the contract, by its own terms, was to purchase a single-family residential home, the purpose of the well requirement was to provide a well that, as the district court described it, would "produce sufficient water for a single family residential dwelling...." Other contract provisions pertinent to the well requirement include the contract's disclaimers and its inspection, "as is", and merger clauses. The Sellers represented in the contract that there were no known violations of applicable laws and that the "property, and all fixtures, *886 appurtenances and improvements thereon, shall be conveyed in their present condition, ordinary wear and tear excepted, unless otherwise agreed" in the contract. The contract allowed Buyers the opportunity to inspect the property. Buyers, in turn, acknowledged that they had been advised of the opportunity to perform inspections and agreed they were not relying on Sellers' representations as to any condition Buyers deemed to be material to their decision to purchase the property. They also agreed in the contract's waiver provision that they had been given ample opportunity to inspect the property and, other than defects or repairs submitted to Sellers in accordance with the contract, Buyers were accepting the property in "as is, where is" condition, without any implied or express warranty by Sellers or the broker.[1] Finally, the contract's merger clause stated, "All prior representations made in the negotiations of this sale have been incorporated herein, and there are no oral agreements or representations between Buyer, Seller or Broker to modify the terms and conditions of this Contract." The contract's two addendums that rescheduled the closing date contained nearly identical clauses.
[¶20] Although Buyers had a right to inspect the well after its completion, Buyers chose not to do so, contending an inspection was cost prohibitive.[2] Buyers claim the well requirement "overrides" the "as is" clause. Describing the well requirement as an "express promise" to complete a fully functional well, Buyers propose that "as is" and inspection clauses "may protect against a failure to disclose in a disclosure statement ... but not against a clear breach of an express contractual duty." Buyers premise their argument on their subjective intent that "fully functional" includes a continuing promise the well will function over time. Buyer's intended interpretation is nowhere found in the well requirement, the plain meanings of that provision's terms, or the four corners of the contract. Buyers fail to cite any pertinent authority for their statement about the limits of the "as is" and inspection clauses, or any basis for exempting the well requirement from those other provisions. The contract does not expressly warrant that a "fully functional" well would perform for a certain period of time after closing, though it could have; and, to the extent Buyers suggest there is an implied warranty in the phrase, "fully functional", we have held that an "as is" clause waives any implied warranties against the seller. Rogers , ¶ 38, 366 P.3d at 1277 (citing Greeves v. Rosenbaum , 965 P.2d 669, 673-74 (Wyo.1998) ). Buyers further fail to explain how the cases they cite involving latent defects and/or claims by home purchasers against home builders apply to Buyers' breach of contract claim against Sellers who did not drill the well. We will not adopt Buyers' position without cogent argument supported by proper cited authority. Hamburg v. Heilbrun , 889 P.2d 967, 968 (Wyo. 1995) (citations omitted). Reading the well requirement within the four corners of the contract, we conclude the plain meaning of the well requirement is harmonious with other relevant contract provisions and should be enforced as written.
[¶21] Buyers also request that we look outside the four corners of the contract and consider circumstances surrounding execution of the agreement to interpret "fully functional" as requiring compliance with industry standards and the State Engineer's minimum construction standards for water wells. Buyers' arguments on this point are unconvincing for two reasons. First, the contract does not reference either set of standards. Second, Buyers have not shown that "fully functional" has a particularized or technical meaning in the water well industry, or that, if it did, we should presume the parties intended "fully functional" to imply compliance with standards *887 for an industry in which neither party participates.
[¶22] In Thornock v. PacifiCorp , we rejected appellant's attempt to employ extrinsic evidence of the parties' subjective intent under the guise of applying the rule of contract interpretation that "[c]ourts should consider the circumstances surrounding execution of the agreement to determine the parties' intention, even in reviewing unambiguous contracts." Thornock v. PacifiCorp , 2016 WY 93, ¶ 19, 379 P.3d 175, 181 (Wyo. 2016) (quoting Ultra Res., Inc. , ¶ 22, 226 P.3d at 905 ). In Thornock , we acknowledged precedent in which the Court considered extrinsic evidence but noted that consideration of such evidence generally is limited to "situations where an otherwise unambiguous term had a different, special, or technical usage at the time the contract was executed." Id. (citations omitted). We explained:
[E]vidence of usage may be admissible to give meaning to apparently unambiguous terms of a contract where other parol evidence would be inadmissible. Thus, circumstances known to the parties at the time they entered into contract , such as what that industry considered to be the norm, or reasonable or prudent, should be considered in construing a contract, while the parties' statements of what they intended the contract to mean are not admissible.
Id . ¶ 20, 379 P.3d at 181-82 (quoting Mullinnix LLC v. HKB Royalty Tr. , 2006 WY 14, ¶ 25, 126 P.3d 909, 920 (Wyo. 2006) ) (emphasis added). Here, Buyers had Mr. Ruby testify about industry and regulatory standards, but the record does not show either party was familiar with the standards when they executed the contract. Buyers cite no authority that would instruct us to simply impute knowledge of the standards on Buyers or Sellers.
[¶23] We acknowledge that "parties to a contract are presumed to enter into their agreement in light of existing principles of law" and the "existing principles of law enter into and become a part of a contract as though referenced and incorporated into the terms of the agreement." Union Pac. Res. Co. v. Texaco, Inc. , 882 P.2d 212, 222 (Wyo. 1994) (citing Black & Yates, Inc. v. Negros-Philippine Lumber Co. , 32 Wyo. 248, 258, 231 P. 398, 401 (1924) ; 4 Walter H.E. Jaeger, Williston on Contracts § 615 at 602 (3rd ed. 1961); Century Ready-Mix Co. v. Lower & Co. , 770 P.2d 692, 696 (Wyo. 1989) ; Tri-County Elec. Ass'n, Inc. v. City of Gillette , 584 P.2d 995, 1007 (Wyo. 1978) ; see also 17A C.J.S. Contracts § 439. "The rule that existing law is part of a contract embraces those laws which affect the validity, construction, discharge, and enforcement of the contract." 17A C.J.S. Contracts § 439 (footnotes omitted). The rule is limited, however, "to those laws which, in their direct or necessary legal operation, control or affect the obligations of such contract." Id. (footnote omitted). The pertinent question, then, is whether the State Engineer's minimum standards are laws that, in their direct or necessary legal operation, controlled or affected the purchase contract obligations. Id.
[¶24] That question is easily answered. The State Engineer's minimum standards do not address whether residential water wells are "fully functional" and their purpose is not to protect well owners from non-functional wells. Instead, the standards provide specifications for various aspects of water wells and drilling procedures for the purpose of protecting against contamination of ground water resources . Rules of State Engineer's Office, Water Well Minimum Construction Standards, ch. 1 § 1(a), chs. 3-4 (Apr. 6, 2010). The standards state, "It is the joint responsibility of the drilling and/or pump contractor(s) and well owners(s) to comply with these standards." Rules of State Engineer's Office, Water Well Minimum Construction Standards, ch. 1, § 1(c) (Apr. 6, 2010); see Wyo. Stat. Ann. § 41-3-909(a)(vi) (LexisNexis 2017) (providing authority to set the standards). Nonetheless, in several provisions relating to the construction and completion of water wells, the standards explicitly direct certain duties to particular persons, such as the well driller, pump installer, or "person/entity engaged in construction of a water well." See, e.g. , Rules, supra ch. 3, §§ 2(a), 2(f)(i)(A), 3(b)(i); ch. 4, § 1(b), (c). In no circumstance do the standards impose an obligation on the *888 well owner to ensure compliance related to any purpose aside from groundwater protection. We therefore reject Buyers' attempt to use the standards to impose a duty on the Sellers that is not otherwise intended by the State Engineer's regulations.
[¶25] In sum, the contract does not define "fully functional" or include any express warranty or other protection related to well performance. We cannot rewrite the contract. Gumpel , ¶ 42, 393 P.3d at 1293-94 (citations omitted) ("Courts are not at liberty to rescue parties from the consequences of a poorly made bargain or a poorly drafted agreement by rewriting a contract under the guise of construing it."). The parties' intent, as evidenced by the contract's plain language, required only that Sellers complete a well that produced water sufficient for a single-family residential home prior to closing.
II. Sufficiency of the Evidence to Support Judgment for Sellers
[¶26] Having determined that the plain meaning of the well requirement, within the purpose and four corners of the contract, evidences no objective intent that "fully functional" has a special or technical meaning, we next review the district court's conclusion that the well was fully functional as of the date of closing. The district court supported its conclusion by finding the well may have been "marginal" but was fully functional for at least a couple of weeks after closing. The court found the well produced sufficient water for a single-family residential dwelling and, based on expert testimony, the well, as constructed, could function.
The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.
Moore , ¶ 9, 341 P.3d at 423 (quoting Miner v. Jesse & Grace, LLC , 2014 WY 17, ¶ 17, 317 P.3d 1124, 1131 (Wyo. 2014) ). "[W]e assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it." Id. ¶ 10, 341 P.3d at 423 (quoting Miner , ¶ 17, 317 P.3d at 1131 ).
[¶27] Applying those review parameters here, the record shows the well was completed and able to produce water sufficient for a single-family residential home while Sellers still resided on the property. Sellers testified that they were able to use the well water without incident during their time in the home. Sellers also testified that they had a new pump installed after closing to improve the well's ability to produce water in future drought conditions, and Buyers agreed to the installation without question or complaint. Mr. Ruby disagreed about whether the well met state or industry standards but testified it could have functioned despite noncompliance. Similarly, Buyers' inspection of the well a year after closing did not prove the well was not functional at the time of closing. The court's findings of fact are consistent with this evidence and not clearly erroneous. We therefore affirm the district court's conclusions that the well was fully functional at the time of closing and Sellers did not breach the contract.
III. The District Court's Evidentiary Rulings
[¶28] Buyers also challenge several evidentiary decisions the district court made at trial. We afford considerable deference to a trial court's rulings on the admissibility of evidence and we will not disturb the trial court's ruling if there is a legitimate basis for it. CL v. ML , 2015 WY 80, ¶ 15, 351 P.3d 272, 277 (Wyo. 2015) (citations omitted). We review an evidentiary ruling for an abuse of discretion and "our primary consideration is the reasonableness of the district court's decision." Stocki v. Nunn , 2015 WY 75, ¶ 20, 351 P.3d 911, 917 (Wyo. 2015) (citation omitted). An appellant bears the burden of showing the district court abused its discretion *889 and we will only reverse an erroneous evidentiary ruling if the appellant proves the error was prejudicial. CL , ¶ 15, 351 P.3d at 277 (citations omitted). The appellant must show a reasonable probability that, without the error, the district court's judgment might have been different. Id. (citations omitted). We address each of Buyers' challenges below to conclude the district court did not commit reversible error in its evidentiary rulings.
A. The State Board of Examining Water Well Drilling Contractors and Water Well Pump Installation Contractors Rules
[¶29] Buyers argue the district court erred when it excluded from evidence a copy of the rules of the State Board of Examining Water Well Drilling Contractors and Water Well Pump Installation Contractors. The district court sustained Sellers' relevancy objection, ruling Buyers had not yet provided sufficient foundation for the court to determine whether the proposed exhibit contained the rules that were in effect when the purchase contract was executed. The court informed Buyers it would need more foundation on when the rules in the proposed exhibit became effective to determine if the exhibit was relevant. After the court's ruling, Buyers questioned their witness about the board and when it may have originally created rules, but ultimately moved to a different line of questioning and never revisited the effective date of the rules in the proposed exhibit. Without knowing if the rules were effective when Mr. Davis drilled the well or the parties entered the contract, the district court reasonably determined Buyers needed to provide more foundation to show relevance and admissibility, which Buyers failed to do. We conclude the district court did not abuse its discretion in excluding the proposed exhibit.
B. Testimony from Driller's Deposition Transcript
[¶30] Buyers requested the district court admit the transcript from Mr. Davis' deposition because they were unable to serve a subpoena on Mr. Davis to testify at trial. The district court allowed Buyers to offer portions of the deposition testimony for admission. The court admitted all the offered portions but one, which Buyers challenge on appeal. In that portion, Buyers' counsel questioned Mr. Davis about different industry standards for drilling materials and whether he knew if the pipe he purchased for the well met the standards. Mr. Davis answered that he did not know what any of the standards were. Sellers objected at trial to admission of the testimony because it did not explain what the standards were and, thus, whether they were relevant to the purchase contract. Buyers responded that the testimony was relevant to whether Mr. Davis purchased substandard pipe. The district court sustained the objection.
[¶31] The district court did not abuse its discretion by excluding Mr. Davis' testimony. Evidence that is not relevant is not admissible. W.R.E. 402. Contrary to Buyers' claims, the selected testimony did not address the condition of the pipe, one way or the other. Mr. Davis stated he did not know what the standards were. Because there was no explanation of the standards or why Mr. Davis' familiarity with the standards was pertinent to the functionality of the well at the time of closing, the district court reasonably excluded the testimony as not relevant. See W.R.E. 402.
C. Invoice of Windcreek Services
[¶32] Buyers incorrectly claim that the district court denied admission of an invoice from Windcreek Services, the company that inspected the inside of Buyers' well with a camera. The record shows the court admitted the exhibit at trial.
D. Video Recording of the Well Inspection and Testimony on Observations of the Recording
[¶33] Sellers objected at trial to Buyers' witnesses testifying about what they saw on a video recording made when Buyers had the inside of their well inspected with a camera. Sellers argued that Buyers did not give a copy of the video to Sellers until a week before trial, well after the discovery cutoff. Because of that late disclosure, Sellers claimed they would be prejudiced by the *890 admission of the video or witnesses testifying about what was on the video because Sellers had not had a fair opportunity to prepare to address what was on the video. The district court confirmed with Buyers' counsel that the video had not been provided to Sellers earlier and then sustained Sellers' objection under W.R.C.P. 26 and W.R.E. 403 and struck the witness testimony about the video's contents. The district court stated, "I think it would be unfair at this point to allow a video disclosed that late to be used as substantive evidence in the trial."
[¶34] Later in the trial, Buyers called Joshua Cowan to testify. As an employee of the company Buyers hired to inspect their well with a camera, Mr. Cowan had been present during that inspection. When Buyers' counsel asked Mr. Cowan to testify about his observations from that video inspection, Sellers objected that Buyers had not timely disclosed Mr. Cowan as a potential witness and, also, that he should not be allowed to testify to the contents of the inadmissible video. The resulting discussion between the attorneys and the court established that Buyers did not disclose Mr. Cowan as a potential witness until they filed their pretrial memorandum. The district court sustained the objections and Buyers submitted Mr. Cowan's testimony and the video as an offer of proof.
[¶35] Buyers now argue Sellers were not prejudiced by the failure to disclose the evidence because Sellers should have known about the video and the potential of a witness like Mr. Cowan to be called when the camera inspection was mentioned at depositions earlier in the case and in Mr. Ruby's expert report. Buyers claim Sellers lacked interest to obtain a copy of the video prior to trial or depose Mr. Cowan. Buyers also claim their failure to provide a copy of the video to Sellers' counsel sooner was merely an oversight by their counsel's office. Buyers do not address the claim at trial that Sellers had issued a discovery request that would have covered the video and witness disclosure.
[¶36] The district court determined Buyers had not timely disclosed the video or Mr. Cowan in accordance with the court's scheduling order and excluded both from evidence for violating W.R.C.P. 26 and being unfairly prejudicial under W.R.E. 403. The scheduling order stated any witness or exhibit not provided to the other party before the discovery deadline may be excluded from presentation at trial. Buyers did not offer either piece of evidence for impeachment purposes and, therefore, were required to disclose them pursuant to W.R.C.P. 26(a) or (e). Under W.R.C.P. 37(c)(1), "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness ... at a trial, unless the failure was substantially justified or is harmless." We have stated that W.R.C.P. 37(c)(1)"provides for automatic exclusion of undisclosed evidence unless there is substantial justification for the failure to disclose, the failure is harmless, or the district court determines another sanction is appropriate." In re Paternity of HLG , 2016 WY 35, ¶ 25, 368 P.3d 902, 908 (Wyo. 2016) (citation omitted). "The party seeking to avoid exclusion has the burden of establishing its failure to comply with the discovery obligations was harmless." Id. (citation omitted) The district court has discretion to determine the proper sanction. Id. (citation omitted).
[¶37] Buyers do not dispute they failed to provide Sellers with a copy of the video until shortly before trial and did not disclose Mr. Cowan as a potential witness until their pretrial memorandum. Sellers might have known the video existed before the discovery cutoff based on references made during depositions and in Mr. Ruby's expert report, but under Rule 26, a discovery request, and the court's scheduling order, Buyers had the obligation to timely provide the information to Sellers. Given that Buyers found the video significant enough to warrant calling Mr. Cowan and Mr. Ruby to testify to its contents and significance, Buyers have not shown how it was harmless to prevent Sellers from viewing the video until well after their opportunity expired to investigate the video and question Buyers' witnesses. Similarly, Buyers' failure to disclose Mr. Cowan as a potential witness prevented Sellers from conducting discovery about his testimony. Buyers have not shown how Sellers could have reasonably prepared for Mr. Cowan's testimony without use of the *891 discovery process. We therefore conclude the district court did not abuse its discretion when it excluded admission of Mr. Cowan's testimony, the video, and other witnesses' testimony to the video's contents.
E. Mr. Ruby's Testimony on Life of Well
[¶38] In response to Buyers' question about how long a water well should maintain its structural integrity, Mr. Ruby stated he would expect 30 to 40 years. Buyers then asked, "If you purchased a property with a new well on it, how long would you expect it to last?" Sellers objected, claiming, in part, that Mr. Ruby's expert report did not contain an opinion on that question. The district court sustained the objection on that basis.
[¶39] Buyers point to the opinion in Mr. Ruby's report: "Steel casing should last the expected life of the well, which should be at least 30 years." They argue this opinion addressed the question excluded at trial, but they fail to argue how the exclusion of the opinion was prejudicial to them other than its alleged contribution to cumulative prejudice of excluding other evidence from Buyers. Therefore, even if the district court erred by precluding Mr. Ruby's response to this question, Buyers failed to show how this alleged error warrants reversal.
F. Mr. Ruby's Expert Report
[¶40] Buyers challenge the district court's decision to admit Mr. Ruby's expert report only as a demonstrative exhibit. Buyers argue without citing support that the report was relevant, had foundation, was well organized, contained copious documentation, and that limiting its admission would be contrary to W.R.E. 701 - 705 and W.R.E. 403. Buyers fail to present any cogent argument challenging the basis for the court's ruling or how that ruling prejudiced Buyers. We therefore will not further consider this alleged error. Hamburg , 889 P.2d at 968 (citations omitted).
G. Cumulative Error
[¶41] Buyers claim the cumulative exclusion of evidence prejudiced them because the trial judge determined Buyers failed to produce enough evidence. "The purpose of evaluating for cumulative error is to address whether the cumulative effect of two or more individually harmless errors has the potential to prejudice the defendant to the same extent as a single reversible error." Essex Holding , LLC v. Basic Properties, Inc. , 2018 WY 111, ¶ 57, 427 P.3d 708, 725 (Wyo. 2018) (quoting In re KMO , 2012 WY 99, ¶ 37, 280 P.3d 1203, 1215 (Wyo. 2012) (emphasis omitted) ). To evaluate cumulative error, we only consider actual errors, and not alleged errors we determine were not erroneous. Id. (quoting In re KMO , ¶ 37, 280 P.3d at 1215 ). Aside from the possible harmless exclusion of Mr. Ruby's response to Buyers' counsel's "life of the well" question, Buyers have failed to demonstrate the district court committed any other evidentiary error. We therefore conclude there was no cumulative error prejudicing Buyers.
CONCLUSION
[¶42] The contract does not define "fully functional" or the other terms of the well requirement beyond their plain meanings. Nor does the contract except the well requirement from application of the "as is," inspection, or merger clauses. There is no indication the parties intended the contract to incorporate industry or State Engineer standards related to water well drilling and we conclude that the State Engineer's minimum well construction standards are intended to protect groundwater, not residential home buyers, and therefore do not control or affect Sellers' obligations under the contract. The record supports the district court's findings of fact and its conclusion that Sellers complied with the well requirement and did not breach the contract. Finally, Buyers have failed to show the district court's evidentiary rulings were individually or collectively reversible error. For these reasons, we affirm the district court's judgment in favor of Sellers.

The contract's inspection clause similarly stated, "Unless Seller receives written notice, signed by Buyer or licensee working with the buyer on or before [the Objection Deadline] of any defect(s) identified by inspectors or engineers that Buyer is requesting to be repaired, the physical condition of the property shall be deemed to be satisfactory to Buyer."

The record contains no evidence that Buyers obtained inspection cost estimates prior to closing. Instead, Buyers contend that the costs they incurred for pulling the well ($600) and for lowering a camera down the well ($480) demonstrate that an inspection prior to closing was not practical.